GRANVILLE S. THOMAS

*v.*

ANNA V. WHITNEY.

*Opinion filed June 21, 1900.*

1. UNDUE INFLUENCE—*there is a distinction as to undue influence between strangers and between persons in fiduciary relation.* There is a well defined distinction between undue influence arising from acts which the law deems fraudulent and undue influence resulting from fiduciary relations between the parties, as the presence of such relationship creates a presumption of influence.

2. FIDUCIARY RELATIONS—*burden of proof in transactions between parties in fiduciary relation.* Transactions between a party and one occupying a fiduciary relation to him are, upon his motion, *prima facie* voidable, and, the relation being established, the burden is upon the other party to show an absence of undue influence by establishing that the transaction was had in good faith upon his part and was equitable and just between the parties, or that the complaining party acted upon the competent and independent advice of another, or such other facts as will satisfy the court that the dealing was at arm's length.

*Thomas* v. *Whitney*, 83 Ill. App. 247, affirmed.

WRIT OF ERROR to the Branch Appellate Court for the First District;—heard in that court on writ of error to the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.

PINNEY & ORR, for plaintiff in error:

Fraud and undue influence, to avoid a deed, must be connected with its execution  *Guild* v. *Hull*, 127 Ill. 523.

The fact that the beneficiary has for years had charge and management of the testator's property is not ground for inferring undue influence.   This is not such influence as the books condemn as undue.   *Rutherford* v. *Morris*, 77 Ill. 414; *Guild* v. *Hull*, 127 id. 523.

The burden of proof is on the plaintiff to prove fraud and undue influence, and not upon defendant to clear the transaction of taint and unfairness. *Audenreid* v. *Walker*, 86 Pa. 114; *Daggett* v. *Lane*, 12 Mo. 222; Story's Eq. Jur. 313.

JOHN F. HOLLAND, for defendant in error:

Undue influence is of two kinds: First, actual undue influence; second, presumptive undue influence. Certain transactions are presumed, on grounds of public policy, to be the result of undue influence. Such transactions are generally those occurring between persons in some relation of confidence one toward another. 27 Am. & Eng. Ency. of Law, 456.

Undue influence is any improper or wrongful constraint, machination or urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not have done or forborne had he been left to act freely. *Smith* v. *Henline*, 174 Ill. 184.

If one of the parties to a contract be of weak mind, and there is either no consideration or a very inadequate one; no other circumstances need be proved to make a case of undue influence. The weakness of mind, as the term is used in this connection, need not amount to legal incapacity. 2 Pomeroy's Eq. Jur. (2d ed.) sec. 947.

The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. The only question is, does such a relation in fact exist? 27 Am. & Eng. Ency. of Law, 461; *Huguenin* v. *Basely*, 2 W. & T. Lead. Cas. in Eq. 597; *Dent* v. *Bennett*, 4 M. & C. 277; *Rhode* v. *Bate*, L. R. 1 Ch. App. 252; *Dunn* v. *Dunn*, 42 N. J. Eq. 431; *Tate* v. *Williamson*, L. R. 2 Ch. 61; *Sands* v. *Sands*, 112 Ill. 225; *Watkins* v. *Brunt*, 46 Wis. 419.

The doctrine that transactions between persons in confidential relations are *prima facie* voidable rests upon the importance of preventing a general public mischief, which may be brought about by means secret and inaccessible to judicial scrutiny, from the dangerous influences arising from the confidential relations of the parties. *Darlington's Appeal*, 86 Pa. St. 519.

Mr. JUSTICE WILKIN delivered the opinion of the court:

This is a writ of error to the Appellate Court for the First District to reverse its judgment affirming a decree of the superior court of Cook county, based on a bill in chancery by defendant in error's testate, Richard U. Piper, against plaintiff in error, Granville S. Thomas.

The bill alleges that for several years prior to January 24, 1893, the complainant had personally known the defendant, believed him to be an honest man, and entrusted and confided to him the care and management of his property in the city of Chicago, (which is shown by the evidence to be worth about $12,000); that at this time complainant was sojourning in Saratoga, New York, and was very much broken down in health, weak in mind and memory because of his advanced age, he being about seventy-seven years old, and much depressed in mind and spirit by reason of the death of his wife, which occurred a few days prior to this date; that defendant, Thomas, knowing the weak and enfeebled condition of complainant, and with intent to overreach and defraud him out of his property, by urgent and repeated requests, promises to give him a home with his family in Chicago, render him medical care (defendant being a physician) and guard his interests, prevailed upon him to go and take up his abode at the home of defendant, in Chicago; that while complainant, being in the condition described, was residing there, defendant, taking advantage of his position as medical adviser and taking advantage of the weakness of complainant, fraudulently and wrongfully induced him to transfer to him certain moneys, aggregating $7797, and execute and deliver to one Moore, trustee, a deed purporting to convey to him in trust, for the benefit of defendant, all his real property, part of which was located in Washington, D. C., (valued at about $22,000,) and the remainder in the city of Chicago, the deed containing the following clauses:

"Said party of the first part is now making his home with Granville S. Thomas, in the city of Chicago, county of Cook and State of Illinois, and an arrangement has been entered into by and between said party of the first part and the said Thomas, under and by virtue of which said Thomas has agreed to provide a home for the said party of the first part, and to care for him during the remainder of his natural life, without making any charge therefor or receiving any compensation, except as follows: Upon the death of said Piper the said Thomas, or his heirs or devisees, are to become the owners in fee simple of the premises hereinbefore described, subject to the condition that if said Thomas shall, at any time during the life of the said first party, fail to furnish and provide a satisfactory home and care for said party of the first part, said party of the first part shall have the right to terminate this agreement, and in such case said Thomas shall be entitled to receive at the rate of $2000 per annum from the first day of April, 1893, until the said party of the first part shall cease to live with said Thomas, as compensation for furnishing a home and caring for said party of the first part, for which sum said Thomas shall have a first and valid lien upon the premises hereinbefore described, said party of the first part to be entitled to receive the net rents and income from said property during his life."

It is further alleged that about June 15, 1895, complainant left the home of Thomas, notifying him that he terminated the contract for care and board, above mentioned. It is alleged the consideration stated as compensation for keeping complainant is unreasonable and unconscionable; that complainant is ready and willing to pay defendant a reasonable sum for board and care during the time of his residence with defendant, but the latter has refused to accept a reasonable sum and allow the trustee to release the deed aforesaid. The prayer of the bill is that the deed of trust may be set aside; that the defend-

ant be allowed a reasonable compensation for the board and care of complainant, and that he be ordered to pay to complainant the balance of the said money and account for the rents of the Chicago property.

The answer of the defendant, for the purposes of this opinion, may be treated as a general denial. The master to whom the cause was referred, found and reported the allegations of the bill to be substantially true. On the hearing the chancellor overruled exceptions to that report, approved the same and rendered a decree accordingly. Complainant having died before the entry of the decree, the name of Anna V. Whitney, as executrix and individually, and Victoria A. Whitney, legatees, were substituted as complainants.

It is recited in the decree that complainant, Piper, gave to the defendant of his moneys, on March 16, 1893, $3000, on April 12 following, $2200, and on October 26 following, $2000; that the deed mentioned in the bill was executed as therein alleged; that the value of the real estate thereby conveyed was $34,000; that the defendant is entitled to retain of the moneys so received, $1860 for board, room and care of complainant from January 22, 1893, to June 17, 1895, and the sum of $550 for services subsequent to January 14, 1893, part of the time as a physician and part of the time as nurse. The decree sets aside all of the transactions between the parties as having been procured by fraud and undue influence on the part of the defendant, and finds upon an accounting that the complainant is entitled to receive from the defendant the sum of $5354.30, and interest thereon from July 12, 1897, the date of the master's report; and it was ordered that the defendant pay said sum to the complainant, with interest, and that the deed of October 17 be set aside, and that the trustee, Moore, re-convey the property within ten days thereafter.

Substantially the only ground upon which a reversal of the judgment below is insisted upon is, that the evi-

dence produced upon the hearing failed to sustain the finding and decree of the superior court.

That the relation of principal and agent existed between the parties at the time of the transactions in question is clearly established by the testimony,—in fact it is not denied by plaintiff in error; and that the complainant was during the time an inmate of his house as a member of his family, and under his care as a physician and nurse, is also established beyond controversy. While the evidence is conflicting as to the mental and physical condition of complainant with reference to his ability to transact the business affairs of life, we think, in view of the extraordinary transactions had between the parties, the weight of the evidence is that he did not possess that ability.

There is a well defined distinction between undue influence arising from acts which the law deems fraudulent, and undue influence resulting from fiduciary relations existing between the parties. "Certain transactions are presumed, on grounds of public policy, to be the result of undue influence. Such transactions are generally those occurring between persons in some relation of confidence, one toward another. The presence of such relationship creates a presumption of influence, which can generally be rebutted by proof that the parties dealt as strangers, at arm's length; that no unfairness was used, and that facts in the knowledge of the one in the position of influence, affecting the matter, were communicated to the other." (27 Am. & Eng. Ency. of Law,—1st ed.—456.) Pomeroy, in his work on Equity Jurisprudence, (vol. 2, sec. 955,) says: "Nothing can tend more to produce confusion and inaccuracy in the discussion of the subject (undue influence) than the treatment of actual undue influence and fiduciary relation as though they constituted one and the same doctrine." The same author says (sec. 947): "The term fiduciary or confidential relation, as used in this connection, is a very broad one. It has been said

that it exists, and that relief is granted, in all cases in
which influence has been acquired and abused,—in which
confidence has been reposed and betrayed.    The origin
of the confidence and the source of the influence are im-
material.    The rule embraces both technical fiduciary
relations and those informal relations which exist when-
ever one man trusts in and relies upon another.    The only
question is, does such a relation in fact exist?"

Transactions between a party and one bearing a fidu-
ciary relation to him are upon his motion *prima facie* void-
able upon grounds of public policy, and the burthen of
proof, the fiduciary relation being established, is upon the
one receiving the benefit to show an absence of undue in-
fluence, by establishing the fact that the party acted upon
competent and independent advice of another, or such
other facts as will satisfy the court that the dealing was
at arm's length, or he must show that the transaction
was had in the most perfect good faith on his part and
was equitable and just between the parties, or, as some
of the authorities say, that it was beneficial to the other
party.    The rule of law applicable to this case is well
and clearly stated in Beach on the Modern Law of Con-
tracts, (vol. 1, sec. 825,) as follows:    "Where the grantor
and grantee sustain relations of trust and confidence,—
which includes not only cases where there exists a formal
and technical fiduciary relation, such as guardian and
ward, parent and child, attorney and client, principal
and agent, but all cases in which confidence is reposed
by one party in another,—and the trust is accepted un-
der circumstances which show that the confidence was
founded on the intimate personal and business relations
existing between the parties, which gave the other party
an advantage or superiority, any transaction between
them will be closely scrutinized by a court of equity, and
relief will be granted against contracts entered into be-
tween them, unless the party claiming the benefit of the
contract shows, by clear and convincing proof, that he

acted with perfect good faith and did not abuse or betray the confidence reposed in him; and where the donee is of superior mental capacity, or the donor of weak or feeble intellect, the presumption of fraud will require strong evidence to remove it." The rule of evidence here announced is recognized in *McParland* v. *Larkin*, 155 Ill. 84.

So far from the evidence in this record establishing good faith and fairness on the part of the defendant, it clearly appears that in each of the transactions set aside he obtained an unconscionable advantage of the complainant. On February 20, 1893, shortly after the complainant became a member of his family, he wrote an order to the National Safety Deposit Company, to which he procured the signature of Piper, requesting the company to allow him, Thomas, to have access to "my box, No. 9472, in the vaults of your company at any and all times. This shall be your authority for the same;" and shortly thereafter took from the box the $3000 first mentioned in the decree, for which he delivered to Piper the following:

"Prof. R. U. Piper, M. D., to G. S. Thomas, Dr.

"To care and board, medical attendance, from January 14, 1893, to April 1, 1893, $3000. Received payment.

Chicago, *March 16, 1893.*     G. S. Thomas,
                                  Mrs. S. J. Thomas."

This extraordinary charge is, upon its face, unconscionable, and the evidence establishes beyond question that it was largely in excess of the reasonable charges for the services rendered. There is nothing in the evidence in the case tending to show that the complainant was afflicted with any disease requiring peculiar skill or special medical treatment, but on the contrary, that he was simply enfeebled by old age.

The $2200 mentioned in the decree was obtained on April 12 of the same year, upon a check written by defendant and signed by complainant, on the First National Bank of Chicago, where the latter had money on deposit.

This sum, it is claimed, was paid for collecting an indebtedness of $9000 due the complainant from the estate of William Sharon, of California, for witness fees in the Sharon-Hill case, the claim being that Piper had agreed to pay for his services in collecting the amount, $3000. This transaction is also upon its face unconscionable, the charge being, under the circumstances, unusual and exorbitant. The evidence shows there was no dispute between the parties as to the $9000 indebtedness, but, on the other hand, that the trustees of the Sharon estate held the money ready to be paid over upon the final judgment in the Sharon-Hill case.

On October 26 of the same year the other $2000 named in the decree was drawn by the defendant upon a check written by himself and signed by Piper, and on the same day a receipt was given therefor, as follows:

"Received of R. U. Piper, $2000, with which to put an addition to house No. 2930 Lake Park avenue, which addition is a part of our agreement not expressed in the deed to George Moore, which, at the request of Dr. Piper, we kept to ourselves, as we did not consider it necessary to be a part of the same, as said addition is for his use.                 G. S. THOMAS."

On August 6, 1894, defendant wrote on the back of this receipt the following: "The within spoken two thousand dollars ($2000) was not paid to Granville S. Thomas as part payment on board, but as a bonus to get him to accede to the terms made in the agreement, and used to make a good place for me; the same is not to be charged to Thomas, but to be considered as a bonus, only,"—and this is signed by R. U. Piper. When it is considered that by the terms of the deed to Moore, for his use, the defendant was to receive some $34,000 worth of real estate for providing a home for complainant and caring for him during the remainder of his life, it can scarcely be claimed that this $2000 transaction was equitable and just to Piper, either as a bonus or for the construction of the addition. On the contrary, the receipt and endorsement

upon it bear the impress of the hand of one over-reaching another, and attempting to fortify himself against liability when he should be confronted with the fraud.

It certainly needs no argument to show that the conveyance of all of complainant's real estate for support and maintenance during the remainder of his life, which, in view of his enfeebled health and old age, could be but a few years, was extravagantly unjust to himself. It is true that the complainant had the right, under the deed, to terminate the agreement, but only upon condition that the defendant should be entitled to receive compensation at the rate of $2000 per annum from the first day of April, 1893, until he should cease to live with him, he (Thomas) to still have a first and valid lien upon the premises conveyed. While an agreement to pay $2000 per annum for his support, care and medical attendance might not have been unreasonable if the transaction stood alone, yet we think, taking into consideration the conveyance of the real estate, the lien given thereon, and the proof as to reasonable compensation for support, care, etc., the charge was not just and reasonable.

Without extending this opinion by commenting upon the testimony of the several witnesses, we entertain no doubt that the decree of the chancellor holding the several transactions referred to voidable at the instance of the complainant below was fully authorized by the facts of the case. The further question then arises, is the compensation decreed to the defendant for the services he rendered the complainant reasonable and just? We have examined the evidence bearing upon this branch of the case, and are not prepared to say that the amounts allowed are not in conformity therewith.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*