Isham v. Bingham.

---

## Giles L. Isham et al. v. Charles L. Bingham et al.

### Gen. No. 12,396.

1. NUNCUPATIVE WILL—*what prima facie establishes undue influence in obtaining.* Undue influence in obtaining a nuncupative will is *prima facie* established where it appears that fiduciary relations existed between the testatrix and the beneficiary and the testatrix reposed confidence in and was accustomed to take the advice of the beneficiary, and the will is procured in his own favor by such beneficiary.

2. NUNCUPATIVE WILL—*how scrutinized by the courts.* A nuncupative will may be valid, but the evidence which supports it will be closely scrutinized.

3. NUNCUPATIVE WILL—*what essential to validity of.* In order to establish a nuncupative will, it is essential that the evidence justify the conclusion that the party alleged to have made the same desired the persons present, or some of them, to bear witness that the declaration forming the basis of such will constituted, and was intended to constitute, a last will and testament.

4. NUNCUPATIVE WILL—*statute with respect to, construed.* The statute pertaining to nuncupative wills is strictly construed.

5. UNDUE INFLUENCE—*when burden to disprove, is upon beneficiary.* The burden is upon the beneficiary in a nuncupative will to show the absence of undue influence where it appears that there existed between himself and the testatrix at the time of the execution a fiduciary relation, and that the testatrix reposed special confidence in him and was accustomed to take his advice.

Bill to contest will. Appeal from the Circuit Court of Cook County; the Hon. HARRY HIGBEE, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1905. Reversed and remanded. Opinion filed May 8, 1906.

**Statement by the Court.** This is a proceeding in chancery, appellants seeking to set aside an alleged nuncupative will as follows:

## " WILL.

Be it remembered that upon the twenty-second (22nd) day of April, A. D. 1901, Sarah J. Leonard, a citizen of the State of Illinois and domiciled in said state, but temporarily sojourning at Thomasville, in the State of Georgia, being at the point of death, disposed of her earthly goods by the following declaration addressed to Charles L. Bingham, in the presence of Bessie Blackshear, T. M. McIntosh and Harriet Davis, namely:

Testatrix said to said Bingham, 'I have never made a will. I want to give you everything I own, to do with it as you please.'

Said Bingham then asked the testatrix, ' How much do you wish me to give to Jennie and Carrie?' To which testatrix replied, ' Use your own judgment.'

Said Bingham then asked the testatrix, ' Shall I give the grandchildren and your nephew and niece in Minnesota equal amounts?' To which the testatrix replied, ' Do as you please. Use your own judgment.'

Said Bingham then asked the testatrix, 'Would you like to have me remember your brother?' To which the testatrix replied, 'Yes.'

Said Bingham then said to the testatrix, 'Now, Mother, is there anyone else in the world you would like to have me remember?' To which the testatrix replied 'No.'

Said Bingham then said to the testatrix, 'You give me all your property to do with it as I please. You wish to have me specially remember Jennie, Carrie, your niece and your nephew in Minnesota and the grandchildren, and your brother, and there is no one else you wish me to remember. Now, is this exactly right, and your final wishes for the disposition of your property which you desire Miss Black-shear, Dr. McIntosh and Auntie Davis to witness?' To which the testatrix replied, 'Yes.'

Bessie Blackshear, T. M. McIntosh and Harriet Davis, being duly sworn, depose and say that they were present together at the deathbed of Sarah J. Leonard at Thomas-ville, Georgia, upon the 22nd day of April, A. D. 1901; that they heard the words spoken by Charles L. Bingham and the words spoken by Sarah J. Leonard above set forth; that they believe said Sarah J. Leonard was at that time of sound mind and memory; that said Sarah J. Leonard declared as above set forth that she wished these deponents to witness what she said as her final disposition of her earthly goods; that said words were spoken by Sarah J. Leonard in the afternoon of the 22nd day of April aforesaid, and she died upon the same day and within a few hours thereafter.

Bessie Blackshear,<br>her<br>Harriet X Davis,<br>mark.

Subscribed and sworn to before me at Thomasville, Georgia, this 29th day of April, A. D. 1901.

W. H. Bibb,<br>Notary Public.

We, the undersigned, hereby certify that the foregoing instrument was written this 27th day of April, A. D. 1901.

Wm. H. Swift,<br>Harriet G. Templeton."

The alleged will is contested by Giles L. Isham, brother of the testatrix, Howard Isham, her nephew, and Edyth Isham, her niece, her only heirs at law. The proponents are Charles L. Bingham, claiming under the will as sole legatee, his wife, Jennie Bingham, and her sister, Carrie L. Woodford, who are mentioned in the instrument. The

testatrix was the second wife of Daniel Leonard, father of
Mrs. Bingham and Mrs. Woodford. She had no children
of her own. The two step-daughters were about eleven
and thirteen years of age when their father married Sarah
J. Isham, the testatrix. Her relations with these step-
children were apparently affectionate and cordial. The
children of Mrs. Bingham and Mrs. Woodford are spoken
of in the will as "the grandchildren." Charles L. Bing-
ham, husband of Jennie Bingham, had attended to Mrs.
Leonard's business affairs for a number of years before her
death. She had been accustomed to make frequent and
lengthy visits to his family. At the time of her death her
money, amounting to over $20,000, was deposited in his
name.

Mrs. Leonard's death occurred in Thomasville, Georgia,
where she had gone for the benefit of the milder climate.
April 19, 1901, Bingham received a telegram from a Miss
Blackshear, with whom Mrs. Leonard was stopping and at
whose house she died, informing him that Mrs. Leonard
was very ill and that "doctors advise please come at once."
The next day he received a second message: "Dysentery;
some better this morning. Think you had better come."
He accordingly went to Thomasville, arriving there April
22, 1901. In the afternoon of that day at about 2:30 P. M.
Mrs. Leonard is said to have made the nuncupative will in
controversy. It was reduced to writing April 27th follow-
ing, after Mr. Bingham had returned to Chicago. It was
then sent to Thomasville, where it was signed and sworn
to April 29, 1901, by the subscribing witnesses. Mrs.
Leonard's illness began with an attack of dysentery and
culminated, according to the testimony of her attending
physician, Dr. T. M. McIntosh, in an acute attack of
Bright's disease.

Dr. McIntosh was not present when at 2:30 P. M. of April
22nd, the nuncupation in question is said to have been
made. Later in the afternoon about 3 P. M. when he called
there an effort was made by proponent Bingham to have
Mrs. Leonard repeat it in substance in the doctor's pres-

ence. This effort seems to have failed. Mrs. Leonard died about 7 P. M. of that day, April 22, 1901.

By stipulation a jury was waived and the issues submitted to the court. Upon hearing the Circuit Court dismissed the bill for want of equity, holding the instrument in controversy to be the will of Sarah J. Leonard, deceased.

A. PAGE SMITH and WOODLEY & PENDLETON, for appellants.

SWIFT, CAMPBELL & JONES, for appellees.

MR. JUSTICE FREEMAN delivered the opinion of the court.

It is first urged by counsel for appellants, that the will to which the proof relates was never reduced to writing, and is not produced; that the instrument offered in evidence does not contain the declaration and is not the will referred to in the testimony of the subscribing witnesses; that it purports to contain a "declaration addressed to Charles L. Bingham in the presence of Bessie Blackshear, T. M. McIntosh and Harriet Davis"; that it is conceded Dr. McIntosh, the attending physician, was not present at the time nor at any time when, as the testimony of the subscribing witnesses tends to show, the declaration in question was made; that said McIntosh was not present until an hour later, and that an attempt was then made by proponent Bingham to have the declarations repeated in the presence of all three of the witnesses named; that this attempt was not, as it is now conceded, successful; that Mrs. Leonard's physical and mental condition was then such that she was incompetent to make a valid nuncupative will, and did not do so; that the will in controversy purports to contain a declaration then made, whereas the testimony of the subscribing witnesses relates to what was said and done about 2:30 P. M., an hour earlier in the day; that the chancellor erred therefore in admitting the depositions of the subscribing witnesses in evidence, "the will to which they had reference never having been reduced to writing and not being before the court."

It is not disputed that Dr. McIntosh was not present at
or about 2:30 P. M. of April 22, 1901, when, as testified by
the subscribing witnesses, Miss Blackshear and Harriet
Davis, the latter a colored nurse who could not read or
write and subscribes the will by making her mark, Mrs.
Leonard made the declaration said to have been committed
to writing and now produced in evidence as her will. Miss
Blackshear states that when the doctor came in about half
an hour or an hour later, proponent Bingham, who now
claims as sole legatee under the will, "made another effort
to have all repeated in his presence, using the substance set
forth in the will"; that Dr. McIntosh questioned Mrs. Leon-
ard, who was "feebler and more exhausted" and "her mind
did not seem altogether as clear as it did during the former
interview between two and three o'clock." The doctor did
not therefore "attempt further to engage her in conversa-
tion." Thus the effort to have all repeated in his pres-
ence was abandoned, and no such declaration as that con-
tained in the written instrument was ever made "in the
presence of Bessie Blackshear, T. M. McIntosh and Harriet
Davis." Miss Blackshear and the colored nurse, Harriet
Davis, however, do testify that such declaration, in sub-
stance, at least, was made by Mrs. Leonard in their pres-
ence about 2:30 P. M. of that day. The evidence was com-
petent, and we find no error in its admission.

Appellants further contend that the will in question is
the result of undue influence, that it shows on its face the
testatrix did not have mental capacity sufficient to enable
her to make a will, that she could not and did not compre-
hend who were the natural objects of her bounty, had no
understanding as to the manner in which she desired her
property to be distributed, did not comprehend the nature
and effect of the provisions, did not intend to deprive con-
testants of a share of her estate, and that the alleged dec-
laration was not a volunary act on her part.

It is clearly shown, and the fact is not discreditable to
proponent Bingham, that relations of trust and confidence
existed between him and the testatrix. He was her busi-

ness manager. Their relations were friendly and confidential. He was the husband of her step-daughter. She trusted him with her money, and he had managed her affairs wisely, so far as appears. Where such fiduciary relations exist between a testatrix and the legatee and the testatrix reposes confidence in and is accustomed to take the advice of the latter, as is the case of client and attorney or principal and agent, and the will is procured in his own favor by such beneficiary, it is said that "proof of these facts establishes *prima facie* that the execution of the will was the result of undue influence." Weston v. Teufel, 213 Ill. 291–299. The burden of disproving such influence rests upon such beneficiary. Thomas v. Whitney, 186 Ill. 225, 231, 232. In the case last cited, the subject of undue influence is considered at some length, and it is said (p. 230): "There is a well defined distinction between undue influence arising from acts which the law deems fraudulent and undue influence resulting from fiduciary relations existing between parties. Such transactions are generally those occurring between persons in some relation of confidence, one toward another. The presence of such relationship creates a presumption of influence which can generally be rebutted by proof that the parties dealt as strangers at arm's length." It is further said that "the burden of proof, the fiduciary relation being established, is upon the one receiving the benefit to show an absence of undue influence by establishing the fact that the party acted upon competent and independent advice of another, or such facts as will satisfy the court that the dealing was at arm's length, or he must show that the transaction was had in the most perfect good faith on his part and was equitable and just between the parties, or as some of the authorities say, that it was beneficial to the other party." In the case at bar it is, perhaps, without fault of his own, apparently impossible under the circumstances for proponent Bingham to fully disprove such influence. At least, we are of opinion it has not been done by the proof in this record. In Marx v. McGynn, 88 N. Y. 357–371, it is said, "there are certain cases in which the law

indulges in the presumption that undue influence has
been used, and those cases are where a patient makes a
will in favor of a physician, a client in favor of his lawyer,
a ward in favor of his guardian, or any person in favor of
his priest or religious adviser, or where other close confi-
dential relations exist. Such wills when made to the ex-
clusion of the natural objects of the testator's bounty are
viewed with great suspicion by the law, and some proof
should be required beside the *factum* of the will before the
will can be sustained. We think this rule of law applies
with great force in this case."

It was said by Mr. Justice McAllister in Trish v. Newell,
62 Ill. 196–205, " there can be no safer practical rule than
that the competency of the mind should be judged of by
the nature of the act to be done from a consideration of all
of the circumstances of the case." The testimony as to
Mrs. Leonard's testamentary capacity at and about the time
the declarations in controversy were made is somewhat
conflicting, and by no means conclusive. Miss Blackshear,
her hostess at the time, and one of the subscribing wit-
nesses to the will, states that as nearly as she could judge
the deceased " was in a very critical condition from Thurs-
day night, April 18, 1901;" that having had limited ex-
perience of nursing, she, the witness, did not feel " prepared
to state positively the condition of mind and body, though
at times her mind was quite clear and at others not so clear.
There seemed to be intervals of consciousness and uncon-
sciousness since Thursday the 18th. She was weak and
exhausted as was natural with any person in a dying con-
dition." She says that at the time the conversation took
place embracing the declaration embodied in the writing,
Mr. Bingham " feeling that Mrs. Leonard's mind was clear
at that time, began to talk of her business affairs." Ap-
parently therefore Mrs. Leonard's mind had not been con-
tinuously clear during the day. It further appears that
the conversation about her business affairs was initiated at
what seemed a propitious moment, not by Mrs. Leonard,
but by proponent Bingham. In this there may have

been no impropriety.   It was perhaps a natural thing to do
for one who had charge of Mrs. Leonard's business matters
and occupied a fiduciary position toward her, but it tends
to awaken doubt as to whether the alleged declarations
were voluntary on her part and whether she comprehended
their nature and effect.   From a feeling of delicacy the
witness withdrew from the room when this conversation
began and was recalled by the colored nurse "Auntie Davis"
at Mr. Bingham's instance.   It was then, as she states, that
the conversation "in substance as set forth in the will"
occurred between Mrs. Leonard and Mr. Bingham.   What
had occurred in the five minutes preceeding we are not in-
formed.   The only part of this conversation relating to the
will in which Mrs. Leonard appears from the instrument
itself to have taken the initiative, is when she is said to
have made the statement, "I have never made a will.   I
want to give you everything I own to do with it as you
please."   This declaration is not alone sufficient to consti-
tute a valid nuncupative will under the statute, but it would
carry more weight as an indication of testamentary capac-
ity at the moment had it been made spontaneously instead
of brought about by a previous conversation initiated by
proponent Bingham, of the character of which we are left
in ignorance.   Up to that time there is nothing to indicate
that Mrs. Leonard had thought of making a will.   The idea
appears to have been suggested to her then and there.
Especially is it necessary where a nuncupatory will consists
as in this case mainly of answers to questions entirely
framed by a person interested in it, that, as said in Dorsey
v. Sheppard, 12 Gill & Johnson (Maryland), 198, "the court
must be more on its guard against importunity, more jeal-
ous of capacity and more strict in requiring proof of spon-
taneity and volition than it would be in an ordinary case."
Such a will may be valid, but the evidence supporting it
should be closely scrutinized.   One of the most essential
statutory requisites of a valid nuncupation to which we
shall refer later is in this case contained wholly in a com-
prehensive question put to Mrs. Leonard by Mr. Bingham

to which she replied only "Yes." We are moreover left in doubt by some of the testimony as to what extent we may depend upon the accuracy of the written reproduction. Miss Blackshear testifies that when she received it from Mr. Bingham she signed it, "feeling the substance to be the same, although details differed somewhat." What the differences were she does not state.

In addition to the testimony of the two subscribing witnesses, the record contains the deposition of Dr. T. M. McIntosh, the physician who attended Mrs. Leonard in her last illness. He states that he called on her three times upon April 22, 1901, the day of her death. The first call was before breakfast. She then spoke to him and knew the attendants, but he testifies that "when she was left alone she would go back into listlessness and she was inattentive to anything. * * * It was very evident she was going to die that day when I saw her in the morning. * * * She did not initiate any conversation at that time. * * * I hardly think she was capable of it. * * * I have some doubt if she was mentally capable of transacting ordinary business at that time. I think it is doubtful if she was. She knew I was there and the nurse was there and would take the medicine when I gave it to her." His second call was made about ten or eleven o'clock of the same day. At that time she looked more like a person going to die, and in his opinion was unable to engage in conversation "except to answer you." He does not think "she was mentally capable of transacting ordinary business" at that time. She could answer questions about herself and did perhaps with some intelligence and recognized him as the doctor, but did not pay much attention to anything unless she was awakened and asked. At the third visit about three P. M. "she was hardly conscious of anything. Her answers were automatic. If asked a leading question she would say 'Yes, yes,' would assent to anything in that way. Her mind was decidedly clouded. I do not think she was hardly conscious of anything. Her answers were parrot like, 'Yes, yes.' She was a good

deal weaker than she was at the second visit. She was lying there, eyes closed, just like a person dying, breathing heavily and oblivious to everything except when you would go and arouse her, and say, ' Are you in pain?' She would say ' Yes, yes,' or ' No, no.' She did not initiate any conversation at that time during the last day and she was incapable of it at my last visit. I think Mr. Bingham was present at that time and Miss Bessie Blackshear and old Harriet Davis. There was something said at that time about a will by Mr. Bingham. * * * He would say ' Didn't you tell me so and so?' or ' Do you want to leave so and so to some member of the family?' * * * and her reply would be ' Yes, yes.' She did not make any statement voluntarily in regard to this will in my presence. All her answers were wholly of that nature." She did not say anything about never having made a will, nor wanting to " give you everything I own to do with as you please," nor " use your own judgment," and made no statement or request for anything. The doctor thinks she did not then know or realize what was being said, that she was not mentally capable of transacting ordinary business, and was not of sound mind and memory. In his opinion she was not able to know and understand the business at the time of the alleged announcement of the said nuncupative will and the effect of the disposition said to have been made by her therein of her property. He was subsequently asked to become a subscribing witness to the instrument in controversy and refused to sign it " because it did not coincide with what I thought." He expresses grave doubt whether Mrs. Leonard could have expressed her desires in the matter even in the morning of that day, " grave doubt if she could have thought or cared anything about it," whether she could have carried on a connected train of thought, although if her attention was called to any thing or person in the room she might understand and answer yes or no. He considers the condition of her mind to have been due to uremic poison and intense pain. She suffered he says from acute Bright's disease, and died about seven o'clock p. m. of that day.

There is testimony however of a clergyman who called about 5 o'clock that afternoon, two hours before Mrs. Leonard's death, at which time he prayed with her, read the 23rd Psalm and the 14th chapter of the gospel of John. He states that at the conclusion of the reading Mrs. Leonard remarked " Beautiful." Mr. Bingham was present. She addressed him as " Charlie " and said " Mr. McDougal, this is Mr. Bingham." Miss Blackshear states that at that time she commented on the beauty of a rose which the minister had in his hand. The clergyman himself however does not mention nor seem to remember such an incident, nor is there other testimony as to such comment.

The testimony of Dr. McIntosh is positive as to the nature of the disease and the existence of uremic poison. It is not shaken so far as we can perceive. There is testimony of other physicians, based upon the assumption that the diagnosis of Dr. McIntosh as to the nature of her disease was correct, that the effect of such poison would be to affect the memory and reasoning powers and create stupor or drowsiness. The capacity of the patient to understand would depend upon the extent of the poisoning and the progress of the disease. The stupor in such cases may, it is said, progress very considerably and yet the patient be able to recognize others and answer direct questions by yes or no. The medical testimony, based on Dr. McIntosh's description of the case, tends to show that if he was correct in his diagnosis, the patient's mental condition was likely to be such as to make it improbable she could understandingly make a will at the time she is claimed to have done so.

The fact that the will was reduced to writing as dictated by Mr. Bingham makes it in effect his statement of what was done and said. In committing it to writing he refers to the declarations as having been made in the presence of Dr. McIntosh, and the instrument thus purports to contain, as we have said, what was said in the doctor's presence, rather than the declarations testified to by the subscribing witnesses as having been made an hour before, when in

their opinion Mrs. Leonard's mind was clearer. This fact tends to throw further doubt upon the accuracy of the writing and discredits its validity as a nuncupative will.

The statute of this State relating to nuncupative wills provides that such will shall be available in law for the conveyance of personal property thereby bequeathed, if among other conditions it shall be proven by two or more credible disinterested witnesses who were present at the speaking and publishing thereof, who shall declare on oath that they heard the testator pronounce the said words, believed him to be of sound mind and memory, and that he or she "did at the same time desire the persons present or some of them to bear witness that such was his or her last will or words to that effect." The proof offered in support of the instrument set forth in the bill and introduced in evidence as the last will of Mrs. Leonard is inconsistent in this respect with what appears upon the face of the instrument and does not justify the conclusion that Mrs. Leonard "did at the same time desire the persons present or some of them to bear witness" that the declaration then made and here relied upon constituted her last will. It is not contended that of her own initiative she made any such request. According to the proof offered, she merely answered "Yes" to the question put to her by proponent Bingham, " Now, is this exactly right and your final wishes for the disposition of your property which you desire Miss Blackshear, Dr. McIntosh and Auntie Davis to witness?" This question purports on the face of the instrument to have been asked and answered in the presence of all three of the persons named. If so put and answered in the presence of Dr. McIntosh it must have been at the time when the effort was being made by Mr. Bingham to have a new nuncupation made and when, as we have said, the attempt was not successful, because the testatrix was not then able to make a will.

This statutory requirement, technically known as *rogatio testium* is no mere form. It is in the highest degree important. The statute in this respect must be strictly con-

strued. Arnett v. Arnett, 27 Ill. 247; Morgan v. Stevens, 78 Ill. 287. In A. & E. Ency. of L., Vol. 30, p. 566, it is said, "the statutes are in this regard strictly construed to the end that the *animus testandi* of which the *rogatio testium* is in truth the evidence may clearly and affirmatively appear." In Morgan v. Stevens, *supra*, it is recognized as "a cardinal principle that the provisions of the statute in regard to nuncupative wills must. have a rigid and strict construction, and must be strictly enforced by courts. * * * It is the received doctrine that the testamentary capacity and the *animus testandi* at the time of the alleged nuncupation must appear by the clearest and most indisputable testimony." This strict enforcement of the statutory provisions is based upon sound reasoning, uniformly recognized in cases of nuncupative wills. In Arnett v. Arnett, *supra*, it was said by Mr. Justice Caton: "It is not to be denied that to allow oral testaments to be established in any case, is opening a door to frauds and impositions, which have sometimes, in spite of all legislative safeguards, been practiced." While in most states the privilege of making nuncupative wills is now extended to all persons, it is carefully guarded and restricted within the terms of the statute. In some states all wills are still required to be in writing. In the present case the nuncupation was, as we have said, committed to writing at the dictation of proponent Bingham, who claims as sole beneficiary. He himself put to Mrs. Leonard the question under consideration, and must be presumed to know better than anyone else all the surrounding circumstances. In causing the nuncupation to be reduced to writing he must be presumed to have inserted correctly what he said as to the presence of Dr. McIntosh when he asked the question, as well as Mrs. Leonard's answer. He was and is deeply interested. It cannot be presumed in favor of the will that by his question he requested Mrs. Leonard to desire a person whom he knew was not present to witness her final wishes. The only alternative reconcilable with what appears upon the face of the writing and with the conceded facts is that the question and

Isham v. Bingham.

answer under consideration were spoken in the presence of Dr. McIntosh, as well as of the other witnesses, at a later time than at 2:30 P. M., at which later time Mrs. Leonard was no longer capable of making, and did not make, a valid nuncupative will. We are compelled to the conclusion that the proof fails to make out a *prima facie* case in favor of the validity of the will.

For reasons indicated the decree of the Circuit Court must be reversed and the cause remanded for further proceedings not inconsistent with the views above expressed.

*Reversed and remanded.*