MARGARET GILMORE, Appellee, *vs.* BERNARD W. LEE, Appellant.

*Opinion filed December 15, 1908.*

1. GIFTS—*gifts causa mortis are not favored in the law.* Gifts *causa mortis,* being donations not made in conformity with the Statute of Wills but without the safeguards cast about the execution of wills, are not favored in the law.

2. FIDUCIARY RELATIONS—*relation of priest and parishioner is a fiduciary one.* The relation between a priest or spiritual adviser and a parishioner is a confidential one, which renders a gift *causa mortis* from the parishioner to the priest *prima facie* void, and the burden is upon the donee to prove the donor's intention to make the gift originated with the donor, without the donee's influence.

3. SAME—*what evidence is not sufficient to overcome presumption that gift to priest is void.* The presumption that a gift *causa mortis* from parishioner to priest is void arises from the fact of the relationship alone and not from the evidence, and such presumption is not overcome by showing that the donor intended to give the donee the notes when she endorsed them and handed them to him, but the proof must show that such intention originated with the donor and was not produced by the influence of the donee.

4. SAME—*existence of a confidential relation casts burden of proof upon beneficiary.* Any gift which is shown by the evidence to have been obtained by undue influence will be set aside without the aid of any presumption, but where a confidential relation exists no other element is necessary to cast upon the donee the burden of showing that the transaction was fair and free from undue influence upon his part, as the dominant party.

5. SAME—*when gift of certificate of deposit to priest may be sustained.* A gift of a certificate of deposit to a priest for masses for the soul of the donor is a gift for a charity and in support of the form of worship of the donor's church, and if it is accepted by the priest for that purpose and he performs the services to which the money was to be applied the gift may be sustained, although the evidence would not sustain gifts for the donee's benefit alone.

SCOTT, J., dissenting.

APPEAL from the Appellate Court for the Third District;—heard in that court on writ of error to the Circuit Court of Jersey county; the Hon. J. A. CREIGHTON, Judge, presiding.

THOMAS F. FERNS, DAVID E. KEEFE, and ROY A. NUTT, for appellant:

Fraud or undue influence, in order to avoid a gift, must be directly connected with the execution of the gift. *Pittinger* v. *Pittinger*, 208 Ill. 582; *Francis* v. *Wilkinson*, 147 id. 370; *Guild* v. *Hull*, 127 id. 523.

The influence must be of such a nature as to deprive the donor of his free agency. *Francis* v. *Wilkinson*, 147 Ill. 370; *Roe* v. *Taylor*, 45 id. 485; *Johnson* v. *Farrell*, 215 id. 542.

Though a fiduciary relation exists, transactions between parties may be deemed valid if it be made to appear that they were entered into with full knowledge of their nature and effect, and that they were the result of deliberate, voluntary and intelligent desire of the parties acting, and not secured by the exercise of the influence engendered as an effect of the relation. *Kellogg* v. *Peddicord*, 181 Ill. 22; *Uhlich* v. *Muhlke*, 61 id. 499.

The solitary circumstances of the existence of the confidential relation of priest and parishioner, is insufficient to create a presumption that the gifts were obtained by fraud or undue influence. The rules of courts of equity which raise such a presumption in transactions *inter vivos* do not apply to testamentary gifts or gifts *causa mortis*. *Matter of Sparks*, 63 N. J. Eq. 242; *Matter of Smith's Will*, 95 N. Y. 516; *Figueria* v. *Taafe*, 6 Dem. 166; *Marx* v. *McGlynn*, 88 N. Y. 358; *Cowee* v. *Cornell*, 75 id. 91; 27 Am. & Eng. Ency. of Law, (1st ed.) p. 511, note 7; *Michael* v. *Marshall*, 201 Ill. 70.

There is no rule of law or morals which prevents ministers of the gospel from receiving gifts, large or small, from their parishioners or from other persons not belonging to their congregation; and in case of such gifts, if there is to be any presumption at all it should be that of honesty on the part of the clergymen, on account of their high and holy

calling. *Greenfield's Estate,* 24 Pa. St. 232; *Jackson* v. *Ashton,* 36 U. S. 229.

HAMILTON & HAMILTON, and H. W. POGUE, for appellee:

The terms "confidential relations" and "fiduciary relations" seem to be used in the courts and by law writers as convertible. *Robbins* v. *Hope,* 57 Cal. 493; 8 Cyc. 564.

The relation of priest and parishioner is a fiduciary relation. 27 Am. & Eng. Ency. of Law, (1st ed.) 511; *McLellan* v. *Grant,* 83 App. Div. (N. Y.) 599; Page on Wills, sec. 419.

The fiduciary relation of priest and parishioner being shown to have existed between the appellant and Mary J. Knapp at the time he obtained possession of the notes and certificate of deposit in controversy, said alleged transfer and possession of said notes and certificate by said appellant are presumptively fraudulent and void. 27 Am. & Eng. Ency. of Law, (1st ed.) 456; 8 id. 647; *Dowie* v. *Driscoll,* 203 Ill. 488; *Rickman* v. *Meier,* 213 id. 516; *McLellan* v. *Grant,* 83 App. Div. (N. Y.) 599; *Michael* v. *Marshall,* 201 Ill. 76; *Burke* v. *Taylor,* 94 Ala. 532.

The fiduciary relation of priest and parishioner being shown, the burden was cast upon appellant to show that the transaction was a fair one and that the parties were upon an equality and dealing at arm's length. Cases cited *supra.*

Gift or conveyance by a party to one sustaining a fiduciary relation to him is upon his motion *prima facie* voidable, and the burden of proof is cast on the one sustaining such a relation to show fairness, good faith and the absence of undue influence. *Michael* v. *Marshall,* 201 Ill. 76; *Jennings* v. *McConnel,* 17 id. 150; *Willin* v. *Burdette,* 172 id. 121; *Ross* v. *Payson,* 160 id. 358; 8 Am. & Eng. Ency. of Law, (1st ed.) 1310, note 1.

A different rule obtains in the case of wills. *Michael* v. *Marshall,* 201 Ill. 76.

In gifts *causa mortis* the burden of proof is upon the donee, and no case of this description ought to prevail unless it is supported by evidence of the clearest and most unequivocal character. *Conklin* v. *Conklin,* 20 Hun, 278; *Cosuahan* v. *Grice,* 15 Moore's P. C. 215; *Hyslep* v. *Gymer,* 1 Ad. & El. 162; *Lewis* v. *Merritt,* 42 Hun, 161; *Deckeschild* v. *Bank,* 28 W. Va. 341; 8 Am. & Eng. Ency. of Law, (1st ed.) 1342, note 1; Cooley on Torts, (1st ed.) 515, 516; Parsons on Contracts, (6th ed.) 2237.

The active agency of the beneficiary in procuring property from a person who is illiterate, enfeebled by age and disease, and in the absence of those having a claim upon her bounty, indicates the probable exercise of undue influence. *England* v. *Fawbush,* 204 Ill. 384; *Weston* v. *Teufel,* 213 id. 299.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

Mary J. Knapp, a widow, sixty-eight or sixty-nine years of age, living alone in Jerseyville, Jersey county, became suddenly and severely ill at her home on the evening of Thursday, the 21st day of April, 1904, and was found lying on the floor in an unconscious condition by Mrs. Kinsella, a neighbor. She recovered consciousness in fifteen or twenty minutes but pneumonia developed, and from this disease she died on the morning of the following Tuesday. She was ignorant, illiterate, superstitious, a very devout member of the Roman Catholic church and a regular attendant upon church services. Bernard Lee, the appellant, was a Catholic priest residing in Jerseyville and officiated at the church which she attended. Mrs. Knapp had been acquainted with him during the time of his residence at that place, which, however, covered but a few months, and had for him a very high regard. After recovering consciousness at the time of the beginning of her illness Mrs. Kin-

sella asked whether a doctor should be sent for, and Mrs. Knapp requested that the priest be first summoned. Accordingly a message was sent to him and he came the next morning. During that day, Friday, April 22, 1904, Mrs. Knapp made to the priest a deed for her real estate in Jerseyville, of the value of about $1600, and delivered to him promissory notes and a certificate of deposit in a bank, all of which, in the aggregate, were of the value of a little more than $1200. On the next day, Saturday, April 23, she executed a will, in and by which she devised and bequeathed all her property, both real and personal, to Father Lee, the priest. Her only surviving heir was her daughter, Margaret Gilmore, the appellee, a married woman residing at Winona, Minnesota, who shortly after her birth was taken into the family of a cousin of Mrs. Knapp and who resided in that family until the time of her marriage, which occurred in the seventeenth year of her age. The relations between mother and daughter were not very intimate but they corresponded, and Mrs. Knapp made several visits to her daughter during the married life of the latter. Mrs. Knapp could not write and her letters were written by Mary Freeman for her. The daughter had never been in Jerseyville during the time of her mother's residence there,— a period of thirty-nine years,—but there was no ill-feeling or unfriendliness between her and her mother, and Mrs. Knapp told several persons before her sickness that she wanted to sell her property in Jerseyville, and if she could do so would go north and live with her folks. After Mrs. Knapp's death the daughter, Margaret Gilmore, filed a bill against Father Lee to set aside the deed and the transfer of the personal property. The bill alleged the existence of a confidential relation between the priest and the deceased, in which the former was the dominant or controlling party and the latter the dependent or yielding one, and charged that the conveyance of the real estate and the delivery of the personal property were obtained by fraud and undue in-

fluence exercised by him. Afterward, the will having been admitted to probate, a supplemental bill was filed by Mrs. Gilmore against the priest and the person named as executor, to contest the will on the ground that it, too, had been obtained by the exercise of fraud and undue influence on the part of Father Lee. The priest by his answer denied the existence of any confidential relation, denied that either the transfer of the property or the execution of the will was obtained by fraud or undue influence, and denied that appellee was the daughter of Mrs. Knapp. To the answers general replications were filed. The question whether appellee was the daughter of the deceased was separately tried and resulted in a decree in favor of the daughter. The validity of the will was tried by a jury and resulted in a disagreement. Thereafter a jury was waived and the issue as to the validity of the will was submitted to be tried by the court without a jury. The will was offered in evidence and the proponents then refused to introduce proof to show its validity and refused to further propose the writing as the will of the deceased, for the reason, as appears from the decree, that the proponents alleged that Father Lee had released and relinquished all his right, title and interest under the said last will and testament. Thereupon, for want of evidence to establish *prima facie* the validity of the will, a decree was entered adjudging that the instrument was not the last will and testament of Mary J. Knapp, deceased. Evidence was then taken in open court in reference to the validity of the gifts of real estate and personal property, the contention of Father Lee being that the transfers were made to him by Mrs. Knapp in expectation of death and were valid gifts *causa mortis.* The chancellor decreed that the transfer of the personalty was a valid gift *causa mortis* to Father Lee. He also adjudged that the deed was void on the theory that real estate cannot be conveyed as a gift of that kind. Mrs. Gilmore appealed to the Appellate Court for the Third District, where the decree of the circuit court

was reversed as to the personal property. From that judgment of the Appellate Court Father Lee prosecuted an appeal to this court, and contends that the Appellate Court erred in failing to affirm the decree of the circuit court.

The evidence clearly established the existence of the confidential relation of priest and parishioner, and showed that the transfer of the personalty, if valid, was a gift *causa mortis.* On the morning after Mrs. Knapp was taken ill, Father Lee, after calling on her, sent a physician to her at her request. Dr. Barry, who was called in consultation before her death, had been her physician and there is evidence that she wanted him, but for some reason which does not appear in the evidence Father Lee sent Dr. Dugan. Father Lee then went to a notary that morning and had a deed drawn for the purpose of conveying to himself the real estate of the sick woman. He did not have the numbers of the lots and at the suggestion of the notary went to the court house and got them. He then left the notary and returned at one or two o'clock and told the notary that he thought it would not be best for them to go to the house together,—that he would go first and the notary might follow. The notary shortly went to Mrs. Knapp's residence and found her in bed and Father Lee by the bed. Mrs. Knapp recognized the notary, and he said to her that he had there a deed conveying her property to the priest, and she replied, "That is what I want." She signed the deed by her mark, the notary holding the pen, but she trembled so that the notary was unable to get the pen down to the paper and the priest laid his hand over hers to steady it and the mark was made. The notary had filled up the acknowledgment before coming to the house and the deed was delivered to the priest. Afterward, on the same day, the priest made arrangements to, and did, administer the final rites of the church to Mrs. Knapp. During the morning he had requested Mrs. Nellie Cope, who lived in a distant part of Jerseyville, to come to the Knapp house to help care for

the sick woman, and when he reached the house to administer the sacrament Mrs. Cope and Mrs. Kinsella were there. The others left the priest alone with Mrs. Knapp and after the sacrament Mrs. Cope returned to the sick room. Henry Sandehouse, the father of Mrs. Cope, testified that he was also there, and Mrs. Cope and Sandehouse both testified that as soon as they came in after the sacrament was administered Mrs. Knapp took certain papers from under the mattress upon which she was lying and handed them to the priest, saying to him that they were notes and mortgages and that she gave them to him; that he opened and read them, and said they were no good unless properly endorsed before witnesses; that she told him to write her name and she would make her mark; that he wrote her name on the back of each of the notes, and in each instance she touched the pen and made her mark in that way; that they signed as witnesses to her signatures; that afterwards she handed to the priest the certificate of deposit for $250 and said to him that she gave him that certificate of deposit "to use for masses for me," and that the certificate was endorsed in the same manner as the notes, but the signature was not witnessed and the papers were taken away by the priest. Sandehouse admitted, on his cross-examination, that he testified as a witness in the county court upon the probate of the will, which was executed on Saturday; that he had never been in Mrs. Knapp's house but once before the time the will was executed and that said occasion was four years before. If that testimony was true he was not present when the gift was made. Mrs. Cope testified that she came to the Knapp home between one and two o'clock on Friday and that Mrs. Knapp was then standing on the floor, barefoot and in her night clothes, with some keys in her hand, where she remained three or four minutes looking for something; that when she turned around she had some papers in her hand; that she then went to the bureau and unlocked the bureau drawer and put her pocketbook in it

and locked it, and that she then went to the bed and put the papers under the mattress and the notes under her pillow and got into bed. She further testified that when she came in she asked Mrs. Knapp how she was, and she said she was not very well; that she spoke distinctly and the witness did not notice any difference in her voice; that she was apparently as strong as she had ever been; that she further said she was feeling well only that she had a pain in her side, and that after she got into bed she told the witness to prepare the table, as Father Lee was coming down to give her holy communion. Mrs. Kinsella, Miss Freeman and Annie Shearin, who assisted in caring for the sick woman and saw her frequently, testified that she was very sick; that she was too ill to have any conversation and could not raise herself in bed, and when they gave her medicine they had to lift her. The evidence was that the last rites of the church are only administered to a person in the last illness, when there is no present hope of recovery.

On Saturday, April 23, the next day after the note transaction, Father Lee went to the office of the circuit clerk and wrote a will for Mrs. Knapp, in which he was the sole beneficiary. He had some discussion with the deputy, and at the suggestion of the deputy he went to the office of the county clerk to get a form for the will, and he dictated it to the deputy in that office, who wrote it on a typewriter. The will as then drawn only included the personal property, and the priest already had the notes and certificate of deposit, but the will was afterward written on another typewriter and the real estate was added. Father Lee took the will to Mrs. Knapp's home on Saturday and it was executed by her.

The relation of priest or spiritual adviser and parishioner is a confidential one. (*Dowie* v. *Driscoll*, 203 Ill. 480; 2 Pomeroy's Eq. Jur. sec. 963; 14 Am. & Eng. Ency. of Law,—2d ed.—194, 1013.) That relation existed between Father Lee and Mrs. Knapp when the efforts were

made to transfer to him as gifts, and without consideration, all of her property. To effect that object different methods were employed: First, the deed of the real estate; second, the endorsement and delivery of the notes and certificate of deposit; and third, the execution of the will. Father Lee was active in having the deed prepared and executed and he also drew the will and procured its execution, and in the absence of contradictory evidence the only justifiable inference from these facts would be that the gifts were procured by his influence and that the attempts to transfer the property by the different methods constituted but one transaction. The natural conclusion would be that Father Lee was equally active in obtaining the gift of the personal property by endorsement and delivery as he was to obtain the same property by will or the real estate by the deed. Mrs. Knapp had a daughter, who was her only heir and in poor circumstances, and on Friday, when she was so ill, a telegram was given to Dr. Dugan to send to the daughter, or he agreed to send one, and did not do it. The evidence is contradictory as to whether the failure to send it was at the instance of Father Lee or not. The evidence would justify a conclusion that there was undue influence in fact exercised by Father Lee.

It is not necessary, however, that such a conclusion should rest upon the facts proved. It is a universal rule, founded upon public policy, that where a confidential relation exists, if a gift is made to the person in whom the confidence is reposed by reason of the relation it is *prima facie* void. The law will presume, from the mere existence of the relation, that the gift was obtained by undue influence or improper means, and the burden of proof rests upon the donee to show that it was the free and voluntary act of the donor. Every confidential relation implies a condition of superiority by one of the parties over the other, and if the superior obtains a benefit, such as a gift, equity raises a presumption against its validity and casts upon the donee

the burden of proving affirmatively good faith, full knowledge and independent action on the part of the donor. (*Thomas* v. *Whitney,* 186 Ill. 225; *Sayles* v. *Christie,* 187 id. 420; *Michael* v. *Marshall,* 201 id. 70; *Dowie* v. *Driscoll, supra;* 2 Pomeroy's Eq. Jur. sec. 956; 14 Am. & Eng. Ency. of Law,—2d ed.—194, 1011; 29 id. 119.) Gifts *causa mortis,* being donations not made in conformity to the Statute of Wills but made without the safeguards cast around the execution of wills, are not favored in the law. (20 Cyc. 1246.) The presumption arising from a confidential relation does not arise from evidence, and if there is undue influence in fact, the existence of any fiduciary relation is immaterial. Any gift proved to have been obtained by undue influence in fact will be set aside without the aid of any presumption, but where a confidential relation exists no other element is necessary to cast the burden of proof upon the beneficiary. Pomeroy says (sec. 955) : "Nothing can tend more to produce confusion and inaccuracy in the discussion of the subject than the treatment of actual undue influence and fiduciary relations as though they constituted one and the same doctrine,"—and this statement was quoted by this court in *Thomas* v. *Whitney.* The donee must prove the absence of undue influence, and in England the rule is, that in order to uphold a gift made to a person standing in a confidential relation it must be shown that the donor had competent and independent advice in making it. This court has not adopted that rule as the only test, but in *Thomas* v. *Whitney, supra,* it was said that the burden is on the one receiving the benefit to show an absence of undue influence by establishing the fact that the party acted upon competent and independent advice of another or such other facts as will satisfy the court that the dealing was at arm's length, or he must show that the transaction was had in the most perfect good faith on his part and was equitable and just between the parties. Father Lee

was bound to show, under these rules, that the intention to give him the property originated with Mrs. Knapp without his influence, and that was not done.

The witnesses Mrs. Cope and Sandehouse were both discredited, he by his previous testimony that he had not been in the house for four years before the Saturday when the will was made, and she by the contradiction by three witnesses as to the material fact that Mrs. Knapp was up and around the room in April, barefoot and in her night clothes, getting her papers together, and stating that she was not very ill when she was about to receive the rites administered to persons in their last illness. If the other witnesses and the circumstances are to be credited, Mrs. Cope's testimony that Mrs. Knapp got the papers from the wardrobe could not be true. The chancellor, however, heard the witnesses testify, and great weight is to be given to his conclusion as to their credibility. It is not necessary to disagree with his conclusion, for the reason that, taking the statements of Mrs. Cope and Sandehouse at their face value, their testimony wholly failed to overcome the presumption against the transaction. It showed only that Mrs. Knapp, when she gave the papers to Father Lee, had an intention to make a gift to him. But that is not the question. It is not sought to set aside the alleged gift on the ground that Father Lee obtained the papers without the consent of Mrs. Knapp or against her will or that she did not intend to give them to him, and, of course, there could be no dispute of the fact that she endorsed them voluntarily, but the question upon which the rights of the parties depend is how that intention was produced. The law presumes, from the existence of the confidential relation, that the intention was produced by the undue influence of Father Lee, and it is no answer to show that Mrs. Knapp intended to give him her property when she endorsed the papers and handed them over, because it must be admitted that she had that

intention. There was no proof that Mrs. Knapp acted upon competent and independent advice, or any affirmative proof of good faith or the absence of undue influence on the part of Father Lee.

So far as the certificate of deposit is concerned, if we accept the testimony of Mrs. Cope and Sandehouse it was handed to the priest to be used for masses for the repose of the soul of the donor. That gift was for a charity and in support of the form of worship of the church to which Mrs. Knapp belonged. (*Hoeffer* v. *Clogan,* 171 Ill. 462.) If the priest accepted the certificate of deposit for that purpose he would be bound to perform the religious services to which it was to be applied, and, as a priest, would earn the money by so doing. We regard the disposition of the certificate of deposit as valid.

The judgment of the Appellate Court is modified so far as to sustain the transaction as to the certificate of deposit and to permit it to be used for the purpose designated by Mrs. Knapp, and as so modified the judgment is affirmed.

*Judgment modified and affirmed.*

Mr. JUSTICE SCOTT, dissenting:

It is to be observed that there is no direct evidence of any witness to any fraud practiced or undue influence used by Fr. Lee. If the execution of the deed, the transfer of the notes and certificate of deposit and the execution of the will be regarded as one transaction, then the evidence of his activity in securing the execution of the deed and of the will and the evidence of the fiduciary relation raise the only valid presumption against the legality of the gift of personal property. If, however, the testimony of Mrs. Cope and Henry Sandehouse be true, Mrs. Knapp deliberately and of her own free will gave to the priest the notes and certificate of deposit. Their evidence as to what occurred at the Knapp

residence is not contradicted, and, so far as the personal property is concerned, the only question seriously considered either by the circuit court or by the Appellate Court was as to whether this evidence of these two witnesses overcame the presumption which both the chancellor and the Appellate Court held existed against the validity of the transfer, and enabled the chancellor to say rightfully that the charge of fraud and undue influence was not established by a preponderance of the evidence. No attack was made upon the reputation of either of these witnesses for truth and veracity. They seem to have testified frankly. Their statements were not unreasonable and do not appear to me to have been unworthy of belief. Certain circumstances were sworn to by other witnesses which tended to cast discredit upon their testimony as to immaterial matters, and it appears that Sandehouse upon a previous trial had made a statement which was inconsistent with his evidence given upon this trial, to the effect that he was at the Knapp house on Friday, April 22, 1904, the day upon which it is claimed the gift was made. Mrs. Kinsella, who was called by Mrs. Gilmore, however, testified that Mr. Sandehouse was there on the day and at the time when it is contended the notes and certificate were transferred. It is therefore not improbable that his earlier statement was a mistaken one. The chancellor, moreover, heard and saw these witnesses, and it seems to me that he was better able than either the Appellate Court or this court to say whether the testimony of Mrs. Cope and Mr. Sandehouse was false.

In *Beall* v. *Dingman,* 227 Ill. 294, we used language as follows: "The rule in chancery cases tried without a jury upon oral evidence is, as has been often stated by this court, that great weight should be attached to the findings of the chancellor, and his findings will not be reversed unless clearly and palpably contrary to the weight of the testimony."

I think the decree entered by the chancellor could not be reversed if due regard was given to the law so stated. He based his finding upon the testimony of two witnesses, whose reputations were not attacked, one of whom was not contradicted at all as to material matters, and the other of whom was contradicted as to such matters only by proof of an earlier statement of his own, which may have been a mistaken one. For us to say that their testimony was wholly untrue when the chancellor placed credence therein is to fail to apply the rule that requires us to give weight to his finding upon the facts where the witnesses testify before him.

The judgment of the Appellate Court should be reversed and the decree of the circuit court should be affirmed.