HENRY FINEGAN v. JOSEPH THEISEN AND JOHN S. FOLEY.

*Deed—Undue influence—Fraud—Priest and parishioner.*

Complainant's uncle made a will in 1877, by which he devised and bequeathed all of his property to the father of complainant. The brothers were Roman Catholics, and the defendant Theisen had been for years their priest and confessor. Immediately after the death of the uncle, defendant Theisen was sent for, and took possession of the will, and of an unwitnessed instrument found, with the will, among the papers of the deceased, executed in May, 1886, by which the deceased certified that it was his wish that the interests of his property in a certain township, in which the land in dispute was situated, should be applied to the benefit of a designated Catholic school, under the direction and management of defendant Theisen. On the day of the funeral Theisen and complainant's father went to the office of an attorney, who had advised Theisen of the invalidity of the unwitnessed paper, but of which fact complainant's father was not informed, and the father executed a deed of the farm willed to him by his brother to Theisen, in trust, to apply the rents and profits to the same use mentioned in the unwitnessed instrument, giving Theisen the right to sell the land and invest the proceeds, which were to remain as a perpetual fund for the support of the school. Complainant's father soon afterwards conveyed

the land to complainant by quitclaim deed in consideration of a life-support, and complainant went into possession under the deed, and was in such possession when an action of ejectment was commenced to recover the land; whereupon complainant filed a bill to set aside the trust deed, and perpetually enjoin the ejectment suit. And, in granting the relief prayed for by complainant, the Court hold: ·

*a*—The relation existing between Theisen and complainant's father was one of trust and confidence on the one hand, and of influence and power on the other; and it was Theisen's duty, under the circumstances, to have communicated to complainant's father the advice given to him as to the invalidity of the unwitnessed instrument.

*b*—The unwitnessed instrument was void, as affecting the will or the estate of the devisee therein named.

*c*—The burden of proof is upon the grantee to show that the grantor acted freely, and with a full knowledge of all of the facts, in the execution of the trust deed.

*d*—Complainant, having been put in possession, was not merely the assignee of a right of action for fraud.

Appeal from Berrien. (O'Hara, J.) Argued May 11, 1892. Decided June 10, 1892.

Bill to annul a trust deed, and perpetually enjoin an action of ejectment brought to recover the land. Complainant appeals. Decree reversed, and one entered granting the relief prayed. The facts are stated in the opinion.

*J. J. Van Riper* and *Edward Bacon,* for complainant.

*Keena & Lightner,* for defendants.

McGRATH, J. James Finegan died September 24, 1887, a bachelor, aged 84 years, the owner of a farm of 80 acres and some personal property. In December, 1877, he executed a will, giving all of his property to his brother, Patrick Finegan. Both James and Patrick were Roman Catholics, and Joseph Theisen, the defendant, was their confessor. Immediately after the death of James the priest was sent for, and went to the house,

took possession of what valuables were upon the person of the deceased, opened a trunk which he found in the house, and took from it all papers found therein, including the will aforesaid, and also a paper of which the following is a copy :

"ROYALTON, BERRIEN Co., MICH., May 4, 1886.
"I, the undersigned, James Finegan, do hereby certify that it is my wish that the interests of my property in Royalton township be applied to the benefit of the Catholic school in St. Joseph, Mich., annually, under the direction and management of the pastor, Jos. Theisen, of the Catholic church.

"JAMES FINEGAN."

The funeral was held September 26, 1887, at 10 o'clock A. M. In the afternoon of the same day the defendant Theisen and Patrick Finegan together went to the office of L. C. Fyfe, a resident attorney, and there Patrick Finegan, in consideration of the sum of one dollar and other good and valuable consideration, executed and delivered to Joseph Theisen, trustee, and to his successors and assigns, in trust,—

"To receive the issues, rents, and profits of the said premises, and of the fund into which said premises may at any time be transposed, and apply the same to and for the use, maintenance, and support of a Catholic school, to be conducted in St. Joseph, by and under the auspices and control of the Catholic church in said St. Joseph; the said party of the first part hereby granting unto the said Joseph Theisen and his successors in trust the full right and power to sell, at public or private sale, and convey, the said premises at any time after the death of said party of the first part, and to reinvest, from time to time as may be necessary, the proceeds of such sale, in such manner as to him or his successors in trust may seem best; the said premises, and after their sale the proceeds thereof, to be and perpetually remain a fund, the profits of which shall be for the maintenance and support of said school. On the death, resignation, or removal of said Joseph Theisen from the pastorship of the Catholic church in said St.

Joseph, the Catholic bishop of the diocese in which the village of St. Joseph is situated shall take the burden of this trust, and administer the same, and he, and all subsequent trustees, shall have the power to appoint his successor in this trust. Should the said Catholic bishop refuse to accept the burden of this trust, then the said premises, or the fund into which they may have been transposed, shall revert to the lawful heirs of the said party of the first part."

—A deed of the farm which had been owned by James Finegan, reserving a life-estate.

In October following the will of James Finegan was admitted to probate, the attorney aforesaid taking the necessary steps, Patrick Finegan paying all the expenses of administration, and the claims against the estate, amounting to several hundred dollars. Within a few weeks after the execution of the deed to defendant Theisen, Patrick Finegan called upon said Theisen, and demanded of him all of the papers belonging to his deceased brother's estate, including the paper a copy of which is above given, and the papers, with the exception of that last named, were delivered to him. He became very angry when the priest refused to deliver the excepted paper to him, and left the house saying he would see whether he could get that paper or not. He called upon Mr. Fyfe in relation to this paper, and was advised by him that the paper was the property of Father Theisen.

In September, 1888, Patrick Finegan executed and delivered to his son, the complainant, a quitclaim deed of the farm in question. The deed describes the grantor as "the only heir at law of the estate of James Finegan, deceased," alleges the consideration to be "several dollars, hereafter to be paid for board and lodging, doctor bills, and care, also for funeral expenses, and everything considered necessary in and about the matter;" and contains the following recitation:

"This land I deed to my son Henry on the following condition: He is to feed and clothe me during my natural life, and to furnish my doctor whenever anything is needed, and also furnish me with everything that may be needed, and at all times to care for me as a son should care for his father, and to see that he is well cared for in every respect, so long as he lives, and at his death to provide him with a good coffin, and give him good, decent burial, in every respect as could be desired of."

The complainant went into possession under this deed, and has since remained in possession. Father Theisen learned of the execution of this deed by Patrick Finegan to his son soon afterwards, and in October following he had a conversation with Patrick, which he describes as follows:

"Having heard that he had again signed over his brother's farm to his son Henry, I asked him if it was true. He said it was. I told him that I thought he was doing wrong, because he knew that it was his brother's will to leave his property to the church for the benefit of the school. He answered that the church was rich enough, and therefore did not need it."

Several witnesses testified to conversations with Patrick Finegan, in which he repudiated the execution of the deed to defendant Theisen, but no steps were taken by him to have it set aside. Patrick died July 5, 1889, aged 80 years. At the time of his death a tenant under complainant was in possession. After several unsuccessful attempts made through the aforesaid attorney to get the tenant in possession to attorn to them, the defendant John S. Foley, bishop of the diocese, commenced ejectment against complainant and his tenant, whereupon the bill herein was filed.

Numerous legal questions are raised as to the validity of the trust deed, but, in the view which we have taken of the merits, it is unnecessary to discuss them.

The paper dated May 4, 1886 (Exhibit A), was in the handwriting of the defendant Joseph Theisen, who says that himself and Patrick Finegan were present at its execution. The value of the farm in question was from $2,500 to $6,500.

How. Stat. § 5789, provides that no will made within this State, except nuncupative wills, shall be effectual to pass any estate, unless it be in writing, signed by the testator, and attested and subscribed by two witnesses. Section 5790 provides that nothing contained in the preceding section shall affect the validity of a nuncupa-tive will, in which the value of the estate shall not exceed $300. Section 5791 provides:

"All beneficial devices, legacies, and gifts whatsoever, made or given in any will to a subscribing witness thereto, shall be wholly void, unless there be two other competent subscribing witnesses to the same; but a mere charge on the lands of the devisor for the payment of debts shall not prevent his creditors from being competent witnesses to his will."

This paper, then, was absolutely void as affecting the former will of James Finegan, or Patrick Finegan's title to the farm in question, either as the heir or devisee of his brother. It is alleged to have been found with the papers of the deceased, but with it was found the will of James Finegan, properly executed in December, 1877, and this original will had been preserved. It had been executed by one who had executed a will, and consequently knew something of the formalities necessary. In any event, if added to the will, without any words of revocation, could it be said to be anything more than a mere expression of a wish to the devisee under the will?

This was the situation when James died. All the papers were, at his death, taken by defendant Theisen

into his possession. Defendant Theisen explains that he did this at Patrick's request. The funeral was held at 10 o'clock in the forenoon. At 2 o'clock in the afternoon of the same day Patrick Finegan is at the house of the priest. The testimony of Joseph Theisen was taken regarding this interview, but it was clearly inad_missible under the statute respecting matters equally within the knowledge of decedent.

Mr. Fyfe, who prepared the deed from Patrick Finegan to defendant, says:

"I was called upon by Father Theisen, and also by Father Theisen and Patrick Finegan. Father Theisen called upon me shortly after the dinner hour on the day the trust deed was drawn ·and executed. He suggested that he supposed that I had learned of the death of James Finegan. I said I had. He presented what has been called the 'Informal Will' (defendants' Exhibit A), and asked me what was necessary to be done with it, so that it might be carried out. I told him it ought to be probated, and, looking it over, I asked him some questions touching the execution of it, and also the school that is mentioned in it. From his answers I concluded that the will was informal; that it could not be probated, and I so informed him. He said that he didn't see why it should not be good, for it was Mr. Finegan's express wish. I told him it might be so, but yet that was my opinion. We had some further conversation about it, he insisting that he thought it was good, and said he would have to see further about it, because it was his duty to have the matter tested. Mr. Finegan was not present then. Some time afterwards, probably an hour and a half or two hours, Mr. Patrick Finegan and Father Theisen came to my office. Father Theisen said that they had arranged matters. I replied I was glad of it, and asked him to take a seat. Father Theisen said that the arrangement was that Mr. Finegan should have the farm in Royalton during his life-time, and that it was subsequently to go to the school. Mr. Finegan asked me if that could be done. I told him it could, and we had some further conversation about it, Father Theisen expressing the wish that the deed should be made to the bishop, and said that an ordinary deed would be

sufficient.   Mr.  Finegan  asked  me  the  effect  of  that.
I  explained  it  to  him,  saying  that,  of  course,  if
an  ordinary  deed  were  made,  the  church  could  do  with
the  property  as  it  wanted  to.   He  said  that  he  didn't
want  that;  that  it  had  been  his  brother's,  and  it  was
his  own  wish  that  it  should  go  to  the  school  alone,  and
not  to  the  church  generally;  and  wanted  to  know  if  that
could  be  done,  and  I  told  him  I  could  so  make  it.   He
also  objected  to  the  deed  being  made  to  the  bishop.
Father  Theisen  somewhat  insisted  that  it  should  run  to
the  bishop,  but  Mr.  Finegan  was  decided,  and  would  not
have  it  so.   Father  Theisen  then  said  that  it  would  be
all  right,  but  suggested  that  he  might  not  always  be
here;  and  then  I  suggested  that  it  might  be  fixed  so  that
the  bishop  should  then  look  after  it,  and  that  was
satisfactory  to  Mr.  Finegan.

"*Q*.  To  whom  was  it  that  Patrick  Finegan  wanted
this  deed  to  run  as  trustee  in  the  first  place?

"*A*.  He  wanted  it  to  go  to  the  Catholic  school  in  the
first  place.   I  explained  that  it  could  not  be  made  in
that  way.   Father  Theisen  suggested  that  it  be  made  to
the  bishop,  and  Mr.  Finegan  insisted  that  it  should  be
made  to  Father  Theisen.

"*Q*.  Upon  what  character  of  deed  did  the  parties
finally  agree?

"*A*.  They  agreed  upon  a  trust  deed  running  to  Father
Theisen,  with  the  bishop  as  successor,  the  property  to  be
for  the  use  of  the  school,  and  I  drafted  it.   After  I  had
drafted  it  the  parties  left  the  office  for  a  time,  while  Mr.
Wyncoop  was  copying  it.   They  subsequently  returned,
and  it  was  read  over  by  me  to  both  Father  Theisen  and
Mr.  Finegan  in  my  office  in  St.  Joseph.   It  was  exe-
cuted  by  Mr.  Finegan  after  that.   *   *   *   *   *   *   *

"*Q*.  In  arriving  at  the  provisions  to  be  included  in
this  trust  deed,  who,  in  the  greatest  measure,  gave  the
directions  as  to  the  provisions?

"*A*.  Mr.  Finegan  did.   *   *   *   *   *   *   *   *   *   *

"*Q*.  You  have  read  over  the  testimony  taken  in  this
cause  of  Father  Theisen,  at  Detroit.   Have  you  observed
any  difference  between  the  recollection  of  yourself  and
Father  Theisen  as  to  some  of  the  occurrences  on  the  day
of  the  execution  of  the  trust  deed?

"*A*.  Not  particularly,  excepting  in  one  instance.

"*Q*.  What  have  you  to  say  about  that?

"*A*.  I  noticed  that  nothing  had  been  said  in  it  touch-

ing Mr. Theisen's call upon me prior to himself and Mr. Finegan coming in together.

"*Q.* At the time of the execution of the trust deed, what was said about and what was done with James' will, shown in defendants' Exhibit A?

"*A.* It was there on the desk, and had been talked about during the conversation, and at the close Father Theisen asked what should be done with it. I told him that he should keep it; that it would show that there was a consideration for the deed."

On cross-examination the witness says:

" *Q.* Who was Patrick Finegan's counsel in the matter of this trust deed, and his arrangement therefor with Joseph Theisen?

"*A.* Both Mr. Theisen and Mr. Finegan referred the legal questions that arose that day to me.

" *Q.* What were these legal questions?

"*A.* Whether this or that could be done. Father Theisen, I remember, when they first came in, explained that they had arranged their difficulties, and said that Mr. Finegan was to have the use of the farm during his life, and it was to go to the school afterwards. The old gentleman asked me if that could be done, and I told him it could, and various questions came up about the matter. The agreement, however, between them, that Mr. Finegan should have a life-estate, and that the property in question should subsequently go to the school, had been, I took it from their conversation, settled upon before they came to my office.

"*Q.* This settlement, as you understood it, had been made after Father Theisen's first visit alone on that day?

"*A.* I do not know when it was made. I took it, however, that such was the case.

" *Q.* You do not know, then, where Joseph Theisen and Patrick Finegan met or came from on that day before they were together in your office, do you?

"*A.* I think I learned from them at that time that they had come down from Father Theisen's house.

" *Q.* What were the difficulties which Father Theisen referred to when he said that they had arranged their difficulties?

"*A.* He merely said that their difficulties had been

settled, and subsequently I learned what those difficulties were,—I mean on that same afternoon.

" Q. State them fully.

" A. That Patrick was claiming under one will and Father Theisen under another.

" Q. What was each contending?

" A. There was no contention in my office between them, only that the old gentleman insisted that it should go to Father Theisen instead of to the bishop.

" Q. Did Father Theisen agree to that, that it should go to him instead of to the bishop?

" A. He agreed that it should be arranged just as we did arrange it, so far as the formalities were concerned.

" Q. You say you learned what their difficulties had been; that Theisen was claiming under one will and Patrick under another. Whose wills,—of what deceased persons?

" A. Of James Finegan.

" Q. What did each one claim under those wills? Was it the farm?

" A. Yes, sir; and I think some personal property or other.

" Q. Do you understand that neither one of them was claiming that farm under those wills?

" A. I understood that they had both been claiming the farm and the personal property in Royalton, and Patrick had been claiming the entire property.

" Q. Then you had not talked with Patrick until after this arrangement of difficulties had been completed?

" A. I think not, Col.

" Q. Then, in making such arrangement of difficulties, Patrick Finegan was without counsel, so far as you know, and received no aid from you?

" A. He had the same counsel that Father Theisen,—myself,—and received such aid as was necessary from me.

" Q. He didn't receive any such aid or have any such counsel until after he and Father Theisen came to your office together, did he?

" A. No, sir; Mr. Finegan fully understood at that time my opinion of the will (defendants' Exhibit A), and I think had known it before coming here, and expressed his desire that there should be no litigation or trouble over the matter."

On redirect examination witness says:

"I understood each had claimed this farm,—Father Theisen for the school under the will (defendants' Exhibit A), and that Mr. Finegan was claiming it under the will which was subsequently probated; that to avoid litigation and trouble they had settled the matter by Father Theisen, for the school, waiving his claimed rights to the personal property in Royalton, and to the farm during Patrick's life-time, and that Patrick should have the personal property in Royalton, and the farm during his life-time. There was no dispute as to any other property, the dispute being confined to this farm, and to the horses and farm implements, utensils, and so forth in Royalton, where the farm was located. The consideration of the deed was this arrangement and settlement of their disputes."

It is nowhere claimed that this was a voluntary renunciation by Patrick Finegan of his rights under the will in consideration of his brother's expressed wish in the latter instrument. The contention is that this was a compromise of conflicting claims. Counsel in their brief set up that there was a good consideration for the deed, viz., the giving up of all rights under the will, Exhibit A, whether valid or not, and the settlement of possible litigation. The very first salutation made by Father Theisen when he and Patrick Finegan called upon Mr. Fyfe was that they had settled their differences. At the outset of his testimony, Mr. Fyfe explains a consultation with Father Theisen shortly after the dinner hour, in which Fyfe advised him that the paper was not a valid will. He is dissatisfied, and responds that he does not see why. Fresh from this interview, Father Theisen meets Patrick Finegan. Nowhere does Mr. Fyfe say that he advised them, when in his office together, that Exhibit A was not a valid instrument. He says:

"It was there on my desk, and had been talked about. The agreement had been, I took it from their conversation, settled upon before they came to my office. He

merely said that their difficulties had been settled, and subsequently I learned what those difficulties were, viz., that Patrick was claiming under one will, and Father Theisen under another."

In answer as to what the contention was, he says:

"There was no contention in my office, only as to whom the deed should run."

According to Mr. Fyfe's testimony, what Patrick Finegan was to do had been decided upon before the parties came to his office, and the fair inference to be drawn from his testimony, taken altogether, is that, from the fact of Father Theisen's first visit to him, his advice as to the validity of the will, and Father Theisen's statement made to him upon the second visit, he inferred that they had in the meantime had a talk over Exhibit A; that Father Theisen had communicated his advice with reference to Exhibit A; that they had had a dispute, and had amicably settled their differences; but there is no evidence of that fact, and, if we give to the testimony of defendant Theisen its full force and effect, it does not support that supposition or understanding. Indeed, there is no allusion in his testimony to the fact that, before his interview with Patrick Finegan, he had already taken the advice of an attorney as to the validity of Exhibit A.

Patrick Finegan was a man nearly 80 years of age. The defendant Theisen was his confessor. It is unnecessary here to define that relation. It is clearly one of trust and confidence on the one hand, and of influence and power on the other. The burden of proof, under such circumstances, is with him having the influence and power, who is claiming to profit by a conveyance to himself, to show that the grantor, having the trust and confidence, acted freely, and with a full knowledge of all the facts. The record here shows that defendant Theisen,

immediately after the funeral of James, sought legal advice, and went into that conference with Patrick Finegan, who was fresh from the grave of his brother, with a full knowledge of the fact that the paper regarding which a difference or difficulty or dispute arose had been pronounced worthless. It was his duty, under the circumstances, to have communicated that information to Patrick Finegan. There is no showing that he did so, but, on the contrary, if there was any trouble or dispute or difference, or possibility of trouble, it was because defendant Theisen had set up a claim under a paper which he had been advised was invalid.

In the case of *Barnes v. Barnes,* 32 Mich. 146, it was held that equity will not allow one to profit by an instrument or conveyance which he has secured by exciting false alarms, where there is such a relation of confidence as gives him a special power over the grantor.

In *Tompkins v. Hollister,* 60 Mich. 470, it was held that, where one occupying a fiduciary relation towards another fails to inform her that she is not liable upon an obligation which she has signed, his neglect so to inform her being for his own benefit, or for that of a bank with which he is connected, he commits a fraud that entitles her to relief in equity.

"And especially," say the Court, "does equity take cognizance of a case where one holding confidential and fiduciary relations to another, and thereby morally and legally bound to communicate facts, conceals them for his own benefit and profit, and to the disadvantage of the other."

In the recent case of *Renard v. Clink,* 91 Mich. 1, MONTGOMERY, J., speaking for the Court, says:

" But where a person is ignorant or mistaken with respect to his own antecedent and existing private legal rights, interests, or estates, and enters into some transaction, the legal scope and operation of which he cor-

rectly apprehends and understands, for the purpose of affecting such assumed rights, interests, or estates, equity will grant its relief, defensive or affirmative, treating the mistake as analogous to, if not identical with, a mistake of fact." Citing Pom. Eq. § 849, and other authorities.

The deed from Patrick Finegan to Joseph Theisen must therefore be held invalid.

It is, however, contended that an action founded in fraud is not assignable. This was not a conveyance of a mere naked right. Complainant was put in possession. *Sweet v. Converse,* 88 Mich. 1.

The decree of the court below must be reversed, and a decree entered here for complainant, in accordance with the prayer of his bill, with costs of both courts.

MORSE, C. J., GRANT and MONTGOMERY, JJ., concurred. LONG, J., did not sit.