## MTYNARCZYK *v.* ZYSKOWSKI.

1. EVIDENCE—CONVEYANCES—CANCELLATION.
   The burden of proof rests on the complainant, in a suit for cancellation on the ground of fraud, to show that a lessee of the ones charged with fraud was in privity with the other defendants, and whether they were innocent third parties or not would be a question of fact. The burden of proof to establish fraud rested also on complainant.

2. PRINCIPAL AND AGENT—FIDUCIARY RELATION—FRAUD—BURDEN.
   Where complainant was a Catholic priest and a man of experience and education and acted as the religious ad-

viser of defendants and had tried to sell real estate to various parties, among whom were defendants, who bought one parcel of him, he was not the agent of defendants, but, as their religious adviser, stood in a fiduciary relation to them so as to charge him with the obligation to show that his relation was fair toward defendants and he did not misuse his position of trust and confidence in selling certain real property and reserving the mineral rights which defendants claimed to have wanted and to have understood they purchased.

3. SAME—WITNESSES—ADMISSIONS.

And, held, in the light of admissions made by complainant tending to impeach his testimony, that he failed to sustain the burden resting on him.

Appeal from Iron; Flannigan, J. Submitted January 5, 1916. (Docket No. 19.) Decided March 31, 1916.

Bill by W. Anzetin Mtynarczyk against Constanty Zyskowski and others for a decree setting aside certain deeds, and other relief. From a decree for defendants, complainant appeals. Affirmed.

*Fred H. Abbott* and *M. S. McDonough* (*M. J. Sherwood*, of counsel), for complainant.

*William P. Belden* and *G. R. Empson* (*John C. Kleczka*, of counsel), for defendants.

STEERE, J. The primary purpose of this bill, contingent on which supplemental relief is asked, is to set aside a quitclaim deed given by complainant to defendant Constanty Zyskowski on January 27, 1908, of the N. E. ¼ of the N. W. ¼ of section 23 in township 43 north of range 35 west, located near Iron River, in Iron county, Mich., on the ground that the same was obtained by fraud and without sufficient consideration; the contention being over mineral rights which had been excepted in a previous deed of the same property.

Private ownership of this 40 began with one Honey-

well, who held title to it and an adjoining 80 acres under a patent from the United States government dated May 4, 1891. He sold the entire 120 acres in 1895 to complainant, who stated that he believed he paid Honeywell $300 for it, by assigning to him an interest-bearing certificate of deposit for that amount in the Marquette County Savings Bank, or some bank in Calumet. A canceled certificate of deposit for $200 issued by the Marquette County Savings Bank to complainant and indorsed by him to Honeywell was subsequently identified and introduced in evidence. The conveyance of the 120 acres from Honeywell to complainant bears date July 17, 1895; the stated consideration therefor being "one dollar and other valuable considerations."

On August 9, 1895, complainant sold the 40 acres in question to defendant Constanty Zyskowski for the sum of $275, conveying the same by warranty deed on that date, "with the mineral rights excepted and reserved." On October 14, 1895, he sold the remaining 80 acres of his purchase from Honeywell to Joseph Konwinski, of Iron River, for $550, giving a warranty deed therefor without any reservations. On August 21, 1907, defendant Constanty Zyskowski gave an option for a mining lease of this 40 acres to defendant Gleason, who, with others, had formed a pool for the purpose of taking such options and exploring the lands covered by them for iron ore. On January 27, 1908, complainant, then of New Kensington borough, Pa., gave a quitclaim deed of this 40 acres, without reservations, to Constanty Zyskowski, for an expressed consideration of $25, which was recorded on February 10, 1908. On June 27, 1908, Constanty Zyskowski and Rosalie, his wife, conveyed by warranty deed an undivided one-fourth of the mineral rights in said 40 to their son, defendant Zygmunt Zyskowski.

Defendant Gleason, with others of the pool which he had formed, organized the D. Gleason Exploration

& Mining Company, to which corporation the option taken in the name of D. Gleason was assigned. On February 20, 1909, defendants Constanty Zyskowski and Rosalie, his wife, together with defendants Zygmunt Zyskowski and Laura, his wife, executed and delivered to the D. Gleason Exploration & Mining Company a mining lease according to the terms of the option previously given. On March 1, 1909, the Gleason Exploration & Mining Company agreed to pay to defendants Frank Jackson and Molly Erickson each 1½ cent royalty upon each ton of ore mined and shipped from this 40 acres, and on June 1, 1910, said Exploration & Mining Company sublet the premises for mining purposes to defendant Davidson Ore Mining Company, under which sublease the last-named company developed and is operating an iron mine upon said property.

Complainant is a native of Russian Poland, and came to the United States when 23 years of age. He studied for the priesthood, receiving his education both in Europe and the United States. About a year after his arrival in America he was ordained a priest of the Catholic Church at Marquette, Mich.

Defendants Constanty Zyskowski and his wife, Rosalie, were also born in Russian Poland, are without education, having never received any schooling, and neither of them can read or write either in Polish or English. About 30 years before this litigation arose they emigrated from Poland with five young children, coming directly to Iron River, where they settled and resided continuously, except for a few months spent in Northern Wisconsin, until 1911, when they moved to Racine, Wis. Constanty's life work was that of a common laborer in the woods, upon the railroad, and at other unskilled employment. He was 73 years of age at the time of the trial. Rosalie thought she "must be about 60 years old."

After complainant's ordination to the priesthood he was successively in charge of different Catholic churches in the north country, at Ironwood, Menominee, Eagle Harbor, and Red Jacket, covering a period of 3 or 4 years prior to his being sent to Iron River in 1895 on a temporary mission, where he remained for a short time, and during the summer of that year he was transferred to Iron River in charge of the Polish Catholic parish of that place. The Zyskowskis were of the Catholic faith and parishioners under him while he was stationed there. It was while stationed at Iron River that complainant bought the 120 acres of land from Honeywell and sold the 40 in question to Constanty Zyskowski.

. The issue as offered by the pleadings and presented by the proofs of the contending parties is correctly and clearly stated in the opinion of the trial court as follows:

"The substance of the complainant's claim is that his original bargain with Constanty Zyskowski contemplated the reservation by him of the ores and minerals and the conveyance to Zyskowski of the surface estate only; that in carrying out the bargain as it was understood by both parties the clause reserving the ores and minerals to the complainant was necessarily and properly inserted in the warranty deed and was known to both parties to be therein when the deed was delivered to Zyskowski; that the quitclaim deed was executed and delivered by the complainant without consideration and in complete ignorance of the fact that the land had any mineral value; that the execution and delivery of the quitclaim deed was solicited by Constanty Zyskowski and by members of his family under his direction; that when he and members of his family solicited the execution of the quitclaim deed, he and they actually knew the land had mineral value, and that he and they not only failed to disclose that fact, but falsely and fraudulently represented the land had no mineral value; that, when he took the option for a mining lease of the property on behalf of him-

self and the other members of the Gleason pool, the defendant Michael Gleason had actual, as well as constructive, notice of complainant's ownership of the minerals; that he knew also of the alleged fraudulent methods pursued by the Zyskowskis to obtain the quitclaim deed, and that all the members of the Gleason pool are, and the corporation organized by them 'is, through Michael Gleason, chargeable with like knowledge.  *  *  *

"The substance of defendant's claim is that the bargain between complainant and Constanty Zyskowski ,contemplated the conveyance to the latter of the fee of the land; that at, or before, the execution of the quitclaim deed, Constanty Zyskowski did not, nor did any person who, under his direction, or in his behalf applied to the complainant to execute the quitclaim deed, know the land was, in fact, valuable for mineral, or represent to the complainant it had no mineral value; and that the inclusion of the mineral exception in the warranty deed was due to a mistake, to correct which the quitclaim deed was executed; but that if the complainant caused the mineral exception to be written in the deed, or, knowing it was in the deed, delivered the same without notice thereof to the Zyskowskis, it was in violation of the agreement between the parties and constituted a fraud upon the rights of the Zyskowskis."

This controversy in all its aspects turns on pure · questions of fact. By the two conveyances complainant gave defendant Constanty Zyskowski, the legal title in fee simple absolute passed to and rests in the latter, subject only to the mining lease he subsequently gave. *Prima facie* the deeds establish his ownership. As they read, there can be no question touching their meaning, force, and effect. In any event, defendant Gleason and the Gleason Exploration & Mining Company held their lease by an unimpeachable, as to them, record title, unless it be shown they were in privity with Zyskowski in fraudulently obtaining from complainant the quitclaim deed which he now seeks to have set aside; and whether they were innocent lessees

would also be a pure question of fact, when reached, with burden of proof resting on complainant.

Complainant's theory and claim is that from the time he purchased the land of Honeywell in 1895 he held title to and was the owner of all mineral rights in it until 1908 (which presumptively and on the face of the records is true), and, although he by the latter deed perfected *prima facie* a complete legal title in Zyskowski, he was induced to do so by false representations, and therefore, as between the two, retained all equitable title to the mineral rights; that the quitclaim deed was voidable as to him, and should be set aside because obtained by fraud, which presumptively and on the face of the records is not true, and therefore the burden of proving the fraud rests upon him.

Complainant only remained at Iron River during the summer of 1895, and it is quite evident that during his short pastorate in that parish he was active in temporal as well as spiritual affairs. He talked with his parishioners and others about land matters, stated he was going to buy land and bring in Polish people to settle upon it, endeavored unsuccessfully to purchase several pieces of land from different parties, took a Polander named Drozdowski, who had brought his daughter from Interior to Iron River for her first communion, around the country in a rig to look at different places, trying to sell him a farm, and offered to sell land to others. From what he was shown to have said and done in that direction defendants' counsel contended that he acted as an agent in securing this 40 for Constanty, and was by reason of acting in such capacity precluded from reserving to himself in the transfer of which he had charge title to mineral rights in the property. Whatever random talk might have been indulged in, we fail to find any sufficient proof of an agency. Regardless of what he said, all that complainant actually did in real estate while located

at Iron River was to buy Honeywell's 120-acre homestead for $300 and sell it to a couple of his parishioners for $825. Constanty says of the matter:

"I stated to him I would like to buy a 40 somewhere, if I could. * * * He said, 'Don't buy anywhere; I will buy for you'; * * * that he has lands. * * * He showed it me first—he called me first and showed me it and sold it to me. * * * He did not sell it to me honestly."

As to the actual bargain of purchase and sale upon which the minds of the parties met and from which the warranty deed with a mineral reservation resulted, the testimony of the contracting parties, who alone have first knowledge, is in direct conflict. Complainant upon his direct examination went into the subject of his mineral reservation and testified positively that Constanty solicited complainant to sell him the 40, which he said he wanted to buy for agricultural use, to raise crops upon, and for a home in his old age; that complainant was reluctant to sell it, but finally told him, "I will sell you but the surface, and I will reserve the mineral rights," and Constanty said "he hardly thought there were any mineral rights," to which complainant replied, "Well, if you want to take the surface, all right, and, if not, I don't care to sell it." On the other hand, Constanty testified positively that he just bought the land, and understood he was buying the whole title; that complainant never said anything about keeping an interest in the land or reserving any mineral rights, and had told him, "Don't buy from the English people, because they will cheat you," and witness did not consult any one else, but relied upon complainant to do everything necessary, because he was a Polish priest, and "made a bargain with me, and he said, 'You will have a remembrance after me'"; that he paid the money about two weeks before he got his deed, which complainant attended to

and had prepared for him, and looked after the title and taxes, "and did it all for me," bringing the deed to Constanty at his home, and "told me not to show it to any one, only lay it aside or put it away;  *  *  * don't show it to anybody, because I have done this thing for you well, or right"; that he gave it to his wife, who put it away, and he knew nothing of any defect or mineral reservation in it until some 13 years later when a Mr. Jackson came to him and he gave an option to Mr. Gleason. About that time the fact that there was a mineral reservation in the deed by which he held title was asserted, which he at first denied, and the deed which his wife, Rosalie, had put away in a trunk at the time complainant delivered it to them, in 1895, was hunted up, when it dawned upon Constanty that the Father was right when he said, "You keep this, and you will have a remembrance after me." He then went with the daughter to consult Mr. Lott, an attorney, who assured them there was a reservation in the deed, and verified it as of record by consulting the register of deeds, advising them "to hunt up Father Mtynarczyk," which was subsequently done, and the quitclaim deed in question obtained from him.

Although iron ore had been discovered in the vicinity of Iron River before 1905, and there were a few mines in that locality, no discoveries of ore are shown to have been made near the Honeywell homstead, and little, if any, value appears to have been attached to the mineral rights in it by any of these parties. Honeywell, who had occupied it as a homestead for a number of years, sold his entire interest in it to complainant for $300. Zyskowski stated he was buying the 40 for a farm, and would not have attached any additional value to it on account of mineral possibilities. Complainant stated that there was no outcropping on the surface of the 120 acres, and nothing to indicate a difference in the 40's, and he thought in a general way they were

alike. In reply to the question why he reserved the mineral rights in the deed of this 40 he simply said, "I wanted to." Asked why he put a mineral reservation in Zyskowski's deed and left it out of Konwinski's deed, he answered "Because I thought while I was at Iron River—and at the time of Konwinski's deed I was at Grand Marais." It was shown that he had unsuccessfully tried to sell this 40 in its entirety for $275 to a merchant of Iron River named Kelly shortly before he sold it to Constanty, and that not long after Constanty bought it he sold the other 80 acres without any reservation to Konwinski at the same price per 40 as he had sold to Constanty.

Some light is thrown on just why and how he came to insert the mineral reservation in the Constanty deed by the testimony of Kelly, who had refused to buy the 40 at the same price it was sold to Constanty. Kelly had lived at Iron River since 1882, and was then running a general store there in partnership with his brother Patrick. Honeywell was a customer at their store, and at a previous time when he had some trouble under a charge of setting out poison for cattle the Kellys became bondsmen for him, indemnified by a mortgage for $600 on his 120-acre homestead, which had not been discharged when Honeywell sold it. Kelly states that he first met complainant in church, and afterwards became acquainted with him; that, knowing complainant had tried to buy several other pieces of land about which they had talked, Kelly told him of the Honeywell homestead, and complainant bought it; that the first agreement was supposed to be $450, but later the price was cut to $300, and complainant came into their store one evening with a release of their mortgage which he asked them to sign, and in answer to some questions about the deal said, "I will pay whatever you want; you sign it and your brother"; that his brother then refused, and later com-

plainant came into the store again with Honeywell, who owed them a bill of $68.02, which complainant promised to bring the money to pay that evening, and Kelly executed a release of the mortgage, but complainant did not come and pay the money as promised, and Kelly went to see him about it, when he offered to sell Kelly the 40 in question for $275, which was refused, and Kelly then made a proposition that he would take the mineral rights in the three 40's for the bill against Honeywell, but complainant told him he had sold the two other 40's, and Kelly finally agreed to take the mineral rights of this 40 for the bill, because it was all he could get; that he then knew nothing about Zyskowski's purchasing the land, and tried once or twice to get complainant to carry out his agreement to give him the mineral rights in it; that in a conversation between them when a justice of the peace named McRae was present complainant asked how mineral rights could be reserved, which Kelly explained to him as best he could, and McRae (who drew the deed to Constanty) also explained it, but complainant left Iron River without ever giving Kelly the mineral rights or otherwise paying the Honeywell bill as he had promised. McRae died over a decade before this case was heard.

If this reservation was inserted in the deed surreptitiously, in violation of Constanty's contract of purchase, and without his knowledge, it would be a fraud upon his rights whatever the object or circumstances were. It may be conceded that in making this purchase Constanty did not, so far as shown, take particular cognizance of the subject of mineral rights and values, and it is plain that then all counted them of little value when thought of. But, if he tells the truth, that no exceptions or reservations were mentioned, and he bought the land as men usually buy property, either real or personal, when nothing is excepted, and no

especial qualifications or reservations are embodied in the agreement, such purchase was presumptively and by common understanding a purchase of the property in its entirety. Apparently acting on the thought which his conversations with Kelly and McRae suggested, complainant had the exception inserted, possibly with a then intent to make good his promise to Kelly, but, if it was surreptitious, unknown to Constanty, as he claims, and contrary to their agreement, it was palpably fraudulent.

This brings us to the question of his obligations in that transaction under the facts as shown and the relations which existed between him and Zyskowski. It is a general rule, as contended by counsel for defendants, that "only clear and convincing evidence can overcome the presumption that the written contract contains the ultimate agreement of the parties in consummation of their previous negotiations," and that the burden of proof rests upon the party seeking to avoid the provisions of a written agreement on the ground of fraud, but an important qualification is recognized where confidential relations of the nature shown here exist and the parties are not on an equality. When such relations appear, it devolves upon the party accused of fraud to sustain his equitable rights by demonstrating that the relation was not abused. Manifestly these parties were not standing on a basis of equality nor dealing at arm's length. Complainant was the pastor and father confessor of the Zyskowskis, and particularly had their confidence as such by ties of race, language, and religious faith in him as their spiritual adviser. They were uneducated and inexperienced foreigners, of the type which progresses slowly when transplanted to a new country, and from necessity or inclination clings to native language, customs, and habits of thought. At the time of this hearing Constanty Zyskowski and his wife, although they had

lived in this country 30 years, were, apparently in intelligence and thought, much as when they came. They claimed to be, and were recognized by the court, as yet unable to understand or speak the English language, and testified through an interpreter. Complainant was an educated clergyman who had pursued his preparatory studies in two countries, and at the time of the hearing spoke nine different languages, including Chinese and Japanese, which he had acquired since leaving Iron River. While there he was in close and friendly relations with the Zyskowskis by reason of nationality and religion. He visited at their home, drank beer with Constanty, was supplied with eggs and milk by the wife, assured them that he would guard their interests, both temporal and spiritual, and cautioned them against people of other nationality. That they implicitly trusted and relied upon him seems established beyond question.

While perhaps slightly overdrawn as to the noble qualities of the Zyskowski family and the distance complainant had at that time traveled over the globe, we think the record sustains in its essentials the following statements and conclusions of the learned circuit judge who heard the case:

"Constanty and Rosalie, his wife, were unlettered and inexperienced, but good, honest, hard-working, God-loving people, and the complainant was of their nationality and a Catholic priest. To show their implicit confidence in and absolute reliance upon the complainant nothing more need be said. It is inconceivable that these uneducated and inexperienced people dealt on a basis of equality with the complainant, who spent many years in school and college in Europe and America; who traveled over half the globe; who spoke nine languages; whose business experience and capacity was by no means ordinary, and, above all, was the pastor of their church and their confessor. It is impossible to believe they dealt with him with any feeling but that of respect, trust, and confidence, and it is

equally impossible to believe the complainant could have entered upon and conducted the transaction without fully appreciating the relations of the parties, and that the Zyskowskis relied on him and him alone to see that what they bought and paid for was secured to them; and when he said to them, 'I will buy for you; I am your priest; I will not cheat you,' the burden should be on him, and not on them, to show what the transaction was; and, knowing they could not read, much less appreciate the effect of the language of the deed, and having said to them, 'Lay this deed away; don't show it to any one, because I have done this thing well, or right,' the burden should be on him, when the deed is finally brought to light, to show it conveyed all that the Zyskowskis bought and paid for. *In re Hartlerode's Estate,* 183 Mich. 51 (148 N. W. 774); *Finegan* v. *Theisen,* 92 Mich. 173 (52 N. W. 619); *Tompkins* v. *Hollister,* 60 Mich. 470 (27 N. W. 651); *Lockwood* v. *Lockwood,* 124 Mich. 627 (83 N. W. 613)."

Fiduciary relations are not limited to technical, legal relations of agency, trusteeship, etc., from which they necessarily arise as a legal presumption, but outside of legal relations they may be shown to exist as a matter of fact, where special confidence and personal dependence for guidance is shown on one side with resulting superiority, influence, and control on the other. Where such confidence has been reposed and betrayed and such influence acquired and abused, equity will intervene to relieve. *Thomas* v. *Whitney,* 186 Ill. 225 (57 N. E. 808).

If the disposition of this case rested alone on the events at Iron River and turned more exclusively on the bare conflicting testimony of complainant and Constanty as to what transpired between them, although the confidential relations shown would demand close scrutiny, it would present a different aspect and give rise to greater misgivings, for the record indicates that the stake involved is a strain on the veracity of the interested parties; but subsequent events tend strongly

to confirm Constanty's version of the original agreement.

After leaving Iron River complainant changed his skies often, lived in many places, traveled in many countries, and saw the customs of many men, during which time he engaged in various activities foreign to and some at variance with his profession. After leaving Grand Marais he traveled for about a year in South America and Europe, returning to Detour, Mich., where he was in charge of a Polish parish for a time, when he again left Michigan. Since then he traveled about a year in China and Japan, and resided at different times in Chicago, Ill., Latrobe, New Kensington, and Pittsburg, Pa., New Brighton, Conn., Utica, N. Y., and Cleveland, Ohio, part of the time occupied in his clerical calling, and at other times engaged in other things. During these years he is not shown to have given any attention to this property, either to ascertain whether developments made since he left indicated any ore in its vicinity, or to learn if taxes were being kept up, or what the prospects were. It had apparently passed from his field of consciousness until an appeal was made to him by Zyskowski about 13 years later for a quitclaim deed to perfect his title to it. Complainant's first reply, so far as shown, was an assurance that he claimed nothing and would give a quitclaim deed if desired, which he later did. He now makes the charge that this deed was obtained by fraud, and his case rests solely upon the recollection and veracity of himself and a Miss Kaszubowski, his secretary, as to the contents of certain letters written to him at least seven years before the trial of the case, none of which had been preserved or were produced. His testimony as to the false representations contained in those letters is flatly denied by Constanty and those who wrote for him. They produce supporting letters from him; he none from them.

Just when correspondence on the subject began between these parties is somewhat in dispute. It was apparently some time in 1906 or 1907, and the witnesses agree in testifying to quite a number of letters being exchanged. Complainant testified that he replied to some of Zyskowski's letters, and some he did not pay any attention to. Those from complainant preserved and produced by defendants (seven in number) are in Polish for the most part, though some English is used, and are without date, although supplemental written evidence of the dates of two of them appears. English translations were introduced in connection with the originals, conceded to be correct in the main, though the translators differed as to the exact significance of a few words or expressions of minor importance. Four of these letters were written before the quitclaim deed was given. They are evidently a broken part of the correspondence, and the order in which they were sent is a matter of inference. They are as follows:

"*Mister Zyskowski:*
   " Do not be afraid. I will not trouble you nor will my heirs. If necessary I will give you a quitclaim deed to that. What else is new with you and how are the Poles getting along?
   "Well wishing,            REV. ANZELM."
"*Mister Zyskowski:*
   "In answer to your letter for papers, I hereby state that they are not necessary, because neither I nor my heirs will demand anything from you. This letter you may keep and use as evidence.
   "Sincerely yours,        FATHER MTYNARCZYK."

Miss Kaszubowski, on cross-examination by defendants' counsel, identified this letter as written by her from Buffalo, under general instructions from complainant, and commented, when questioned by complainant's counsel, on the absence of any heading of place or date. A slip was later produced which Zyg-

munt Zyskowski testified he had cut from the top of the letter, to get the address in order to reply to it, which she identified and translated as follows:

"530 Wilson Street, BUFFALO, N. Y.
"July 20, 1907.

*"Father Zyskowski:*
"You send to that lawyer T. Kennedy in Pittsburg your original deed and about two blanks quitclaim deed and he will fix that right.

"Those shysters in Iron River that made out the deed, of course don't understand anything, and you will again have trouble. Before a deed is placed on record it must first be examined by a good lawyer.

"If you wish I will sign that old stuff that you sent me.

"Well wishing,    REV. ANZELM.
"I am laying sick in a hospital."

*"Father Zyskowski:*
"Why don't you want to send the original deed with description to the lawyer, so that he could look it over whether everything is in good order?

"I took him for the purpose that everything should be done well, so that you will not place any blame on me any more.

"Well wishing,    REV. A. MTYNARCZYK,
"Phoenixville, Pa., R. F. D. No. 3."

On the back of the letter is the following:

"In this deed, it ought to be inserted that I do quitclaim all mineral rights. Do you understand?"

In this letter, otherwise in Polish, the words "inserted that I do quitclaim all mineral rights" were written in English.

Complainant states that he first learned of a mine being opened on this land while he was a pastor at Utica, through a notice in a Polish paper published in Milwaukee which was called to his attention by an associate. This was said to be in 1909. The three remaining letters in evidence were evidently written subsequently, and contain no charge of misrepresenta-

tion or fraudulent inducement. It is urged that this should not be imputed against him, as they were only for the purpose of trying by friendly advice and persuasion to obtain some recognition of what he had done for the Zyskowskis and compensation for the same. One of these letters states that an attorney at Crystal Falls had written him two times about the Honeywell property, stating that abundant rich deposits of iron ore had been discovered upon it, advising as follows:

"And therefore hang well together, men [or stick well together, fellows], so that some one will not cheat you. Surely if anything should come up, then please let me know, and I will yet defend you.

"You and Konwinski be prudent. Don't let anybody take advantage of you. The lawyer bases his claim on the fact that Honeywell's wife did not sign the deed to me. But where could one search for her? I am giving him absolutely no information. I am your well wisher. I wish you good health and all success.

"REV. ANSELM.

"I inclose envelope with address."

An envelope produced in evidence and identified as the one in which this letter was received bore the postmark, "Utica, N. Y. Nov. 25, 1909."

"*Mr. Zyskowski:*

"I heard there was some awful fortunes in this land. The lawyers in Crystal Falls are after me to take it away from you some way. Let me know about all this. If you have taken much money, then offer me something out of it too, because if the attorneys will give you trouble, then I will not defend you. Well wishing,

"REV. ANSELM.

"I inclose envelope for reply."

On July 6, 1910, Joseph Zyskowski, Constanty's son, received an undated letter from complainant in part as follows:

"Your kind letter received and contents carefully noted. I wish your papa would have such good heart

and give me something out of his fortune.  All that he got through me.  I'd pray for him in my holy sacrifice of mass.    *    *    *    How is your father and mother? They must be an old people.  I know them well to be a good sort of people, and I remember your sister.  I pray for her soul.  How is getting along Mr. Konwinski?  He must be well off.    *    *    *

"Sincerely yours,        REV. A. MTYNARCZYK."

Aside from the one written by his secretary, complainant admitted all these letters were in his handwriting.

The undisputed evidence shows complainant did not act upon hasty impulse in executing this quitclaim deed.  He testified that a desultory correspondence about it had been going on for over a year.  He was fully advised from the start that the claimed defect in his original conveyance which he was asked to remedy was the mineral reservation.  He had abundant time to investigate to his satisfaction and took the matter to his lawyer before he acted.

In extenuation of his failure to appreciate fully what he was doing, and lack of business precaution in thus allowing himself to be inveigled into signing the deed, complainant explained on his direct examination that he was then under great mental stress by reason of a criminal prosecution pending against him in which he was convicted, but had appealed to the supreme court of Pennsylvania.  It was during the time this case was pending in the supreme court that he traveled in the Orient, and he states that he was in Canada when the appeal was decided in his favor.  The subject thus opened by complainant was pursued in cross-examination by defendant's counsel with some tenacity, eliciting derogatory admissions, in the light of which his statement that he was never suspended from the priesthood taxes credulity.  While the facts thus disclosed, which it is unnecessary to detail, have, as complainant's counsel contend, no direct bearing upon the issue,

and would be inadmissible were complainant not a witness, yet, having voluntarily offered himself as a witness to establish his case, the cross-examination was legitimate as bearing upon his credibility, and we cannot agree with the contention of his counsel that the facts shown should be wholly disregarded because unduly emphasized and unfairly dwelt upon by opposing counsel. They have no place here except for the one purpose of impeachment, and, of course, can only be considered in that connection in the usual manner impeaching facts are regarded in weighing a witness' testimony.

To review the evidence further would unduly extend this opinion. A careful reading of this record leads inevitably, we think, to the conclusion that the most satisfactory proof and safest ground disclosed is the written evidence, by which we find title to the property in controversy stands without exception or reservation in defendants, sustained by the written assurance of complainant that neither he nor his heirs will demand anything, and that he will, as he did, give a quitclaim deed to put the title where we find it.

Complainant has not overcome by clear and convincing evidence the presumption that the quitclaim deed which he deliberately executed to perfect Constanty's record title contains the agreement of the parties, understandingly made in consummation of previous negotiations.

The decree is affirmed, with costs to defendants.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, BROOKE, and PERSON, JJ., concurred.